UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, et al., ) | Civil No. 07-1883-MMA(WVG) |
| ) | |
| Plaintiffs, ) | ORDER GRANTING IN PART AND |
| ) | DENYING IN PART KINDER |
| v. ) | MORGAN'S MOTION FOR |
| ) | PROTECTIVE ORDER REGARDING |
| KINDER MORGAN ENERGY PARTNERS, ) | SCOPE OF DEPOSITION TESTIMONY |
| et al., ) | (DOC. # 153) |
| ) | |
| Defendants. ) | |
| ) | |

Defendants Kinder Morgan Energy Partners (hereafter "Defendants") filed a Motion for Protective Order Regarding Scope of Deposition Testimony. Plaintiffs City of San Diego (hereafter "Plaintiffs") filed an Opposition to Defendants' Motion. Defendants filed a Reply to Plaintiffs' Opposition. The Court HEREBY ORDERS:

Plaintiffs have proposed to take the deposition(s), pursuant to Federal Rule of Civil Procedure (hereafter "FRCP") (30)(b)(6), of Defendants' persons most knowledgeable (hereafter "PMK depositions"), on 61 separate topics. Among the topics is one in which Plaintiffs seek discovery regarding Defendants' annual profits from the operation of the Mission Valley Terminal (hereafter "MVT").

1  Defendants have objected generally to the scope of the requested PMK
2  depositions and specifically to the disclosure of the MVT's profits.
3         On November 10, 2011, the Court held a hearing on Defendants'
4  Motion for a Protective Order Regarding Scope of Deposition
5  Testimony and Defendants' request to preclude Plaintiffs from asking
6  questions about the MVT's profits. After considering the parties'
7  briefs and the arguments made at the hearing, the Court tentatively
8  ruled in favor of Defendants subject to the Court's additional
9  research and reflection. Having concluded that process, the Court
10 modifies its tentative ruling and GRANTS in part and DENIES in part
11 Defendants' Motion for a Protective Order.
12       1. <u>Time Period for Depositions</u>
13       Many of the deposition topics identified by Plaintiffs ask
14 for information dating as far back as 1980. Defendants did not come
15 into possession of the MVT facility until 1998 when they purchased
16 the MVT. Neither party submitted any evidence regarding the nature
17 of the transaction and whether, and to what extent, Defendants
18 assumed the liabilities of their predecessor. Accordingly, this
19 Court will not engage in speculation. Nevertheless, the issue before
20 the Court can be resolved without having to rely on the legal
21 documents involving that transaction.
22       Plaintiffs argue that Defendants' conduct (and presumably
23 that of its predecessor), from at least 1980 to the present, is
24 relevant to establish that Defendants' conduct was "reprehensible"
25 in reacting to the leakage of petroleum products from the MVT to
26 property owned by Plaintiffs, specifically the Qualcomm Stadium
27 site. Plaintiffs argue that Defendants had a "go slow, go cheap"
28 approach to remediating the contamination that existed well before

August 14, 2004, the outside limit of the statute of limitations pertaining to this lawsuit. Plaintiffs contend that evidence of Defendants' egregious conduct prior to August 14, 2004, is relevant to establish Plaintiffs' damages and any punitive damages that may be justified.

Defendants respond, and Plaintiffs do not dispute, that the Court has established that the actionable time period for Plaintiffs' negligence, nuisance, and trespass claims are from August 14, 2004 forward. Accordingly, Defendants argue that evidence pre-dating August 14, 2004 simply is irrelevant in establishing Plaintiffs' entitlement to punitive damages and any restoration damages pursuant to California Civil Code § 3334.

Defendants argue that there simply is no evidence that they acted irresponsibly or reprehensibly in their effort to remediate the Qualcomm Stadium property. In fact, Defendants rely on favorable reports of the California Regional Water Quality Control Board, and the apparent lack of evidence that the Plaintiffs' use of the Qualcomm Stadium property or the water beneath it has in any way been impeded. Defendants contend that Plaintiffs have failed to demonstrate even a *prima facie* case that Defendants' conduct was in any way reprehensible. Consequently, there is no basis upon which Plaintiffs can justify their foray into discovery dating back to 1980 or at any time before August 14, 2004.

Although Defendants argue that evidence to establish negligence, nuisance, and trespass is limited to their conduct from August 14, 2004 forward, it is not accurate to state that evidence that pre-dates August 14, 2004 is entirely irrelevant in Plaintiffs' quest to establish Defendants' reprehensible conduct which could lay

1  the foundation for punitive damages. Although at this time, it
2  appears that Defendants may have acted appropriately and quickly to
3  remediate the contamination, Plaintiffs are entitled to explore
4  Defendants' conduct and actions prior to August 14, 2004. However,
5  Defendants' exploration in that regard need not include conduct
6  dating back to 1980.
7       In TXO Production Corp. v. Alliance Resources Corp., 509 U.S.
8  443, 462, n. 28 (1993), the U.S. Supreme Court stated: "[u]nder
9  well-settled law... factors such as these [wrongdoing in other parts
10 of the country and a defendant's net worth] are typically considered
11 in assessing punitive damages." Similarly, in Pacific Mutual Life
12 Insurance Co v. Haslip, 499 U.S. 1, 21-22 (1991), the U.S. Supreme
13 Court affirmed consideration of "defendant's conduct, the duration
14 of that conduct, the defendant's awareness, any concealment and the
15 existence and frequency of similar past conduct" in determining the
16 appropriateness of punitive damages. (emphasis added). See also
17 State Farm Automobile Insurance Co. v. Campbell, 538 U.S. 408, 419
18 (2003) ("conduct involving repeated actions or was an isolated
19 incident" is relevant in determining the reprehensibility of
20 defendant's conduct and the award of punitive damages) citing BMW of
21 North America, Inc. v. Gore, 517 U.S. 559, 576 (1996). As these U.S.
22 Supreme Court decisions make clear, past similar conduct is relevant
23 to determine whether Defendants' conduct was reprehensible. Despite
24 the seeming lack of available evidence at this time suggesting that
25 Defendants' conduct was reprehensible, Plaintiffs are nonetheless
26 entitled to reasonably explore through the discovery process, the
27 existence of such facts, or facts that are likely to lead to
28

admissible evidence that establish Defendants' alleged reprehensible conduct.

The question before the Court is: What are reasonable limitations to discovery that permit Plaintiffs to obtain facts from Defendants in this regard? As indicated above, Plaintiffs request information dating back more than three decades to a time when Defendants had absolutely no ownership or possessory interest in the MVT. To require Defendants to produce information from so long ago is not only burdensome and oppressive, but would serve no useful purpose even if Defendants could obtain this information relatively easily. Since Defendants did not have control over the MVT until they purchased it in 1998, any reprehensible conduct by Defendants' predecessor would have little to no relevance in establishing Defendants' alleged reprehensible conduct. This is true no matter what the legal transaction documents between the two stated. The goal of punitive damages is to receive a measure of retribution and deterrence for a defendant's bad conduct. Haslip, 499 U.S. at 19. Certainly, while Defendants may have inherited the liabilities of their predecessor when they purchased the MVT, it can hardly be said that they engaged in reprehensible conduct deserving of punitive damages for anything that occurred before their purchase of the MVT in 1998.

Defendants complain that the burden placed upon them to prepare their PMK designees and other percipient witnesses for depositions will be financially burdensome even if they are required to prepare the designees for depositions regarding events dating back to August 14, 2004. They contend that the costs explode exponentially if they are required to prepare witnesses to address

deposition topics for time periods prior to 2004. The Court is not insensitive to the burdens placed upon a litigant, both financially and in terms of labor, to prepare witnesses, especially PMK designees who will bind the business entity with their answers, to respond accurately and thoroughly on topics spanning many years into the past. The Court must balance the needs of Plaintiffs to obtain the requested information against the burden to Defendants in having to provide it. FRCP 26(g)(1)(B)(iii). Among the considerations that the Court should consider are: whether the discovery request is posed for an improper purpose such as to needlessly increase the costs of litigation [FRCP 26(g)(1)(B)(ii)] and whether the discovery request is unreasonable, unduly burdensome or expensive. [FRCP 26(g)(1)(B)(iii)].

The Court, having considered these factors and the arguments of counsel, concludes that it is reasonable to require Defendants to respond to topics dating back to the time when it purchased the MVT in 1998 but not before that time. The Court finds that the relevance and materiality of the information is not outweighed by the burden imposed upon Defendants in producing qualified and prepared PMKs to respond to the noticed deposition topics.

### 2. Defendants' Conduct At Other Sites

Plaintiffs have indicated a desire to obtain discovery involving Defendants' conduct at their other petroleum sites. They argue that the conduct is relevant in establishing punitive damages. Defendants' conduct at other facilities was specifically discussed at the hearing, even though that topic was not noticed as a PMK deposition topic.

1    In the interest of judicial economy and to avoid the
2    potential of another discovery dispute, the Court provides a ruling
3    on this issue.
4    It is here the Court draws the line. Defendants' conduct at
5    other sites, whether in California or elsewhere, is not relevant to
6    show that Defendants acted reprehensibly in this case involving the
7    MVT and the Qualcomm Stadium property. As the <u>Campbell</u> court stated,
8    "[l]awful out-of-state conduct may be probative when it demonstrates
9    deliberateness and culpability of the defendant's action in the
10   State where it is tortious, but that <u>conduct must have a nexus to</u>
11   <u>the specific harm suffered</u> by the plaintiff." <u>Campbell</u>, 538 U.S. at
12   422 (emphasis added). From a reading of Defendants' Securities and
13   Exchange Commission Form 10-K filing for 2010 (Declaration of Paul
14   Faust in Support of City of San Diego's Opposition to Defendants'
15   Motion for Protective Order Regarding Scope of Deposition Testimony,
16   Exh. A), it is evident that Defendants have many terminals in many
17   states and are involved in remediation litigation in a number of
18   jurisdictions. If <u>lawful</u> out-of-state conduct must have a nexus,
19   *ipso facto*, tortious out-of-state conduct also must have a nexus to
20   the specific harm suffered by Plaintiffs for it to be relevant. To
21   determine whether a nexus between another site owned by Defendants
22   and the MVT site exists necessarily would involve a series of mini-
23   trials to establish comparable similarities between the two sites
24   sufficient to justify drawing a parallel between Defendants' conduct
25   at the other site and Defendants' conduct at the MVT site. There are
26   simply too many variables to make such a comparison beneficial and
27   constructive. Moreover, whatever probative value such discovery may
28   have is greatly outweighed by the burden imposed upon Defendants, as

well as a danger of unfair prejudice, confusion of the issues, and undue waste of resources. Accordingly, the Court concludes that Plaintiffs shall not inquire of Defendants' witnesses or PMK designees regarding Defendants' conduct at other sites.

### 3. Defendant's Profits and Net Worth

Defendants also have objected specifically to Plaintiffs' noticed deposition topic concerning profits made at the MVT. Plaintiffs, relying on Starrh and Starrh Cotton Growers v. Aera Energy LLC, 153 Cal. App. 4th 583 (2007), contend that profits from the MVT are particularly relevant in determining damages pursuant to California Civil Code § 3334. Plaintiffs cite Starrh as countenancing an interpretation of § 3334 that profits obtained by a defendant from illegal dumping of contaminants onto another's property can be a measure of damages. Id. at 604. Certainly this is true within the context of Starrh, where the evidence demonstrated that the defendant in that case intentionally pumped wastewater from its oil extraction wells into two unlined ponds. While some of the wastewater evaporated, the vast majority of it leaked into the ground and eventually migrated to, and contaminated, the aquifer under the plaintiff's property, where the plaintiff grew cotton and other crops. The evidence demonstrated that it was much less expensive for the defendant to dispose of its wastewater in this fashion rather than by safer, more environmentally sound, but certainly more costly methods. Against this backdrop, the Starrh court determined that it was appropriate to consider the defendant's profits in assessing damages. This makes sense since the defendant clearly profited by the decision to use a less costly mode of disposing of its wastewater. However, that is not the case here.

1    There has been no evidence presented to the Court that
2 Defendants profited from the leakage of its petroleum products onto
3 the Qualcomm Stadium property, and perhaps only a very small area of
4 the entire 166-acre site. In fact, common sense dictates the
5 opposite conclusion, that Defendants actually lost money by losing
6 petroleum products through leakage. In other words, there was no
7 "benefit obtained," as used in § 3334, by Defendants. Moreover,
8 Defendants have expended millions of dollars to remediate the
9 Qualcomm Stadium property and are likely to spend millions more
10 before the process is complete. Plaintiffs are not spending any of
11 their own money to restore the property to its previous condition.
12    Nonetheless, Defendants' profits or net worth may be relevant
13 in determining punitive damages. See TXO Production Corp., 509 U.S.
14 at 462, n. 28; see also Kelly v. Haag, 145 Cal. App. 4th 910, 914
15 (2006) (incidentally a case cited by Defendants). The question
16 becomes whether the appropriate inquiry should be limited to the
17 profits earned by the MVT specifically or by Defendants' entire
18 enterprise generally. Defendants cite Kelly, 145 Cal. App. 4th at
19 915-16, for the proposition that the MVT's isolated profitability is
20 irrelevant. Rather Defendants' net worth as a whole at the time of
21 trial is what is relevant. While it is surprising to the Court that
22 Defendants would take this position given their vast wealth as
23 reflected in the SEC 10-K filing, it is an accurate statement of the
24 law. See Adams v. Murakami, 54 Cal. 3d 105, 109 (1991); Washington
25 v. Farlice, 1 Cal. App. 4th 766, 777 (1991); Ambassador Hotel Co. v.
26 Wei-Chuan Inv., 191 F.3d 459 at *1 (9th Cir. 1999). In this regard,
27 the Court agrees with Defendants that the profitability of the MVT
28 in isolation is not relevant; it is Defendants' net worth that is

1  critical because it is possible that the MVT facility could be
2  extremely profitable while the remainder of Defendants' business is
3  suffering a terrific loss. Given that the burden is on Plaintiffs to
4  establish Defendants' financial condition, <u>Kelly</u>, 145 Cal. App. 4th
5  at 916, Plaintiffs are somewhat at the mercy of Defendants to
6  provide that information. Therefore, Plaintiffs shall be permitted
7  to inquire during the PMK deposition(s) about Defendants' net worth.
8  However, the Court does not agree with Defendants' suggestion that
9  such discovery should be delayed pending the outcome of motions yet
10 to be filed.
11       Accordingly, it is HEREBY ORDERED that Defendants' Motion for
12 a Protective Regarding Scope of Deposition Testimony is GRANTED in
13 part and DENIED in part.
14       1. Plaintiffs' PMK deposition topics may address:
15       (a) events beginning on the precise date that Defendants took
16       ownership of the MVT in 1998 forward, and;
17       (b) Defendants' net worth.
18       2. Plaintiffs' PMK deposition topics shall not address
19 Defendants' conduct at Defendants' other petroleum sites.
20       IT IS SO ORDERED.

DATED:  November 18, 2011

_____
Hon. William V. Gallo
U.S. Magistrate Judge