1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *et al.*,<br><br>                              Plaintiffs,<br><br>    vs.<br><br>KINDER MORGAN ENERGY PARTNERS, L.P., *et al.*,<br><br>                              Defendants. | CASE NO. 07-CV-1883-MMA(WVG)<br><br>**OMNIBUS ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE EXPERT EVIDENCE**<br><br>[Doc. Nos. 202, 203, 204, 205, 206, 207, 208, 210, 211, 212, 213, 214, 215 & 216] |

This matter is before the Court following a hearing on the parties' pending dispositive motions. After further consideration of the moving papers, exhibits, and oral arguments, the Court affirms its tentative rulings as explained in further detail below and enters judgment in favor of Defendants Kinder Morgan Energy Partners, L.P., Kinder Morgan Management, L.L.C., Kinder Morgan Operating, L.P. "D," SFPP, L.P., Kinder Morgan G.P., Inc., and Santa Fe Pacific Pipelines, Inc. (collectively, "Kinder Morgan").

## I.  BACKGROUND

This action arises from events surrounding the contamination and prolonged remediation of soil and groundwater on approximately 166 acres of City-owned land surrounding and underlying Qualcomm Stadium in San Diego, California (the "Property"). [First Amended Complaint ("FAC"), Doc. No. 32 ¶ 26.] Kinder Morgan owns land adjacent to the Property, on which it

operates the Mission Valley Terminal.  [*Id.* ¶ 27.]  The Mission Valley Terminal is an industrial facility engaged in the business of transporting, storing, and distributing petroleum products.  [*Id.*]  Since the 1960s, the Mission Valley Terminal has been the central hub of the gasoline distribution system in San Diego County.

The following facts are not reasonably in dispute.  As early as 1992, the City was on notice that Kinder Morgan and its predecessors released petroleum products into the soil, contaminating the Property and groundwater.  [*Id.* ¶ 30; Defs.' Stmt. of Uncontroverted Facts ("SUF") ¶ 1.]  In 1992, the California Regional Water Quality and Control Board ("Water Board") ordered the investigation and remediation of contamination at the Mission Valley Terminal.  Pursuant to this order, Kinder Morgan and its predecessors have spent approximately $60 million addressing the petroleum beneath the Property.  Since 1992, the City has received copies of Kinder Morgan's reports to the Water Board, and has provided input in the Water Board's oversight of remediation efforts.  [*Id.* ¶ 2.]  Despite the contamination, the City has never cancelled a sporting event at the Property, lost use of the Property, or lost any revenue from operating the Property.  [*Id.* ¶ 17.]

From 2001 through 2004, the City considered suing Kinder Morgan for damages allegedly caused by the contamination.  [*Id.* ¶ 3.]  In 2005, the Water Board issued Addendum No. 5 to its order, requiring Kinder Morgan to complete the soil remediation by December 31, 2010, and the groundwater remediation by December 31, 2013.  [Add. No. 5 to CAO 92-01, Doc No. 206-4.]  On August 14, 2007, the City sued Kinder Morgan, alleging that petroleum releases from the Mission Valley Terminal contaminated the Property and damaged the City.  [Doc. No. 1.]  The following claims remain: public nuisance, continuing private nuisance, continuing trespass, negligence, California Business and Professions Code section 17200, and declaratory relief.  [Doc. Nos. 32, 97, 98.]

## II.   SUMMARY JUDGMENT

A party may move for summary judgment on all or part of its claims.  Fed. R. Civ. P. 56(a).  A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

1    Civ. P. 56(c)(2).  "The moving party bears the initial burden to demonstrate the absence of any

2    genuine issue of material fact." *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir.

3    2007) (citation omitted); *see also Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216, 1221

4    (N.D. Cal. 2003) ("As the moving party not bearing the burden of proof at trial, Defendant may

5    carry its burden of production on summary judgment by showing that there is an absence of

6    admissible evidence that [its product] caused Plaintiff's injuries.").  "Once the moving party meets

7    its initial burden, . . . the burden shifts to the nonmoving party to set forth, by affidavit or as

8    otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial."

9    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks and citations

10   omitted).

11       "[T]o defeat a properly supported motion for summary judgment . . . the nonmoving party

12   must introduce some 'significant probative evidence tending to support the complaint.'"  *Fazio v.*

13   *City & Cnty. of S.F.*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249,

14   252).  However, when assessing the record to determine whether there is a "genuine issue for

15   trial," the Court must "view the evidence in the light most favorable to the nonmoving party,

16   drawing all reasonable inferences in [its] favor."  *Horphag Research Ltd.*, 475 F.3d at 1035

17   (citation omitted).  The Court may not make credibility determinations or weigh conflicting

18   evidence.  *See Anderson*, 477 U.S. at 255.  The ultimate question on a summary judgment motion

19   is whether the evidence "presents a sufficient disagreement to require submission to a jury or

20   whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.

21                            **III.  DISCUSSION**

22   **A.    Kinder Morgan's Motion to Exclude the Expert Testimony of Mr. Ray Forrester**

23       As a threshold matter, Kinder Morgan moves to exclude the testimony of the City's expert,

24   Ray Forrester, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals,*

25   *Inc.*, 509 U.S. 579 (1993).  The Court finds that Forrester's opinion fails to satisfy the

26   requirements of *Daubert*, and therefore **GRANTS** Kinder Morgan's motion.

27       **1.    Mr. Forrester's Opinion**

28       The City retained Forrester as an expert to provide his opinion regarding the remediation

1    efforts at the Mission Valley Terminal.  Forrester is a chemical engineer with over 30 years of

2    experience remediating contaminated sites.  [*See generally* Forrester Rep., Doc. No. 206-4.]

3            Generally, Forrester opines that Kinder Morgan has not adequately remediated the

4    Property, and that alternative technologies are better equipped to quickly and effectively remediate

5    the site.  Forrester's opinion rests, in large part, on the presupposition that both the groundwater

6    and soil on the Property should be remediated to "background condition."[1]  He is aware of the

7    Water Board's remediation requirements, yet asserts that the goals of the Water Board and those of

8    the City as a landowner are not the same.  Forrester states:

9        The goals of the [Water Board] and those of a landowner who has been
         impacted by contamination from an off-site source may be similar but not
10       the same.  The Water Board has goals designed to address the interest of the
         state and community as a whole.  The impacted landowner has concerns
11       about the safety of those accessing their property, their property value, and
         its usability.  Each of these three factors is heavily impacted by the time
12       required to remedy the contamination that has migrated onto their property.
         . . . Just because [Kinder Morgan's] actions may have been approved by the
13       [Water Board] doesn't mean that the [Water Board] would not have
         approved more responsive and timely attempts to address the
14       contamination. . . .  The distinction between the [Water Board's] goals and
         those of the City of San Diego is integral to understanding the points made
15       in my opinions provided below.

16   [Forrester Rep., Doc. No. 221-7 at 11.]

17           Forrester's report contains the following eleven opinions:

18       1.    The Mission Valley Basin is an identified resource to meet the City of San
               Diego's long-term water supply and storage needs.
19
20       2.    Petroleum impacts resulting from releases from the Mission Valley
               Terminal have impacted the City of San Diego's property and the Mission
               Valley Basin, which represents a long-term water supply and storage
21             source for the City of San Diego.

22       3.    Petroleum releases have occurred at the Mission Valley Terminal prior to,
               during, and since 2005, and will likely continue to occur into the future.
23             These ongoing releases have affected the groundwater and soils on the City
               of San Diego's property and will likely impact groundwater in the future.
24
25       4.    Releases from the Mission Valley Terminal have occurred since the initial

26   _____

27         [1] Background condition refers to the state of soil and water prior to being contaminated by petroleum
     products.  More technically, "background means the concentrations or measures of constituents or indicator parameters
     in water or soil that have not been affected by waste constituents/pollutants."  [Add. No. 5, Doc. No. 208-3 at 223 n.2.]

28

1987 response plan to address petroleum impacts.  These releases have contributed further to the contamination and resulted in larger quantities of petroleum requiring remediation, and have extended the duration of remediation.

5.    The remediation technologies selected at the site were not implemented in a timely manner.  The remediation plan described in the October 1999 CAP was not sufficiently responsive to address then-known contamination by the completion date(s) required in the Order and subsequent addenda.

6.    The Defendant's current remediation approach has not met their December 31, 2010, deadline to achieve specified target levels in the CAP, and will not meet their December 31, 2013, scheduled deadline.

7.    Contingency plans identified by the Defendant's consultants as feasible to reduce the scheduled remediation times and achieve remediation deadlines have not been implemented.

8.    If the contingency plans recommended by the Defendant's consultants were implemented in a reasonable time after being proposed, the actions would have reduced the time required for remediation.

9.    If the contingency plans recommended by the Defendant's consultants are implemented, they would reduce contaminant mass at the site, reduce the time required to achieve remediation endpoints, and increase the likelihood of reaching background.

10.   The approximate cost to implement the (Steam Enhanced Extraction) SEE in the source area of the Qualcomm site, which will assist in returning the remediation to its planned schedule of December 31, 2013, is $19.2 million.

11.   The approximate cost to remediate the downgradient dissolved (Methy tertiary butyl ether) MTBE and (tertiary butyl alcohol) TBA plume could range from current approach being taken by Kinder Morgan (cost unknown) to $107 million, depending upon the type of technology chosen, time required to reach background groundwater concentrations, and the certainty of the treatment technology's ability to treat those concentrations.

[*Id.* at 3-4 (original formatting omitted).]

## 2.    Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  Pursuant to Rule 702, a witness qualified as an expert in "scientific . . . knowledge" may testify thereto if "(1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

The trial court acts as a gatekeeper to the admission of expert scientific testimony under

Rule 702.  *Daubert*, 509 U.S. at 579-80.  The Court must conduct a preliminary assessment to "ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." *Id.* at 589.  This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevancy prong).  *Id.* at 592-93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

The *Daubert* analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions.  *Daubert*, 509 U.S. at 595.  However, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997).  As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* Nothing in either *Daubert* or the Federal Rules of Evidence requires the admission of opinion evidence connected to existing data "only by the *ipse dixit* of the expert." *Id.*

**3.     Analysis**

First, Kinder Morgan asserts that Forrester is not sufficiently qualified as an expert to provide an opinion on certain aspects of the remediation efforts and technologies.  The Court disagrees.  Forrester received his Bachelor of Science degree in chemical engineering from the Missouri University of Science and Technology in May 1972.  He has been actively involved in remediation of contaminated sites since 1980.  During this time period, he has investigated and evaluated potential remedies, designed remediation programs, and implemented remediations at numerous sites throughout the United States.  The Court is satisfied that Forrester's experience with petroleum releases and remediation practices, together with his general knowledge of chemical engineering, adequately qualifies Forrester opine on the remediation efforts at the Property.

Kinder Morgan next challenges the admissibility of Forrester's report and testimony on the ground that his proffered opinions fail to meet the standard set forth by the Supreme Court in *Daubert*—that expert testimony must be "not only *relevant*, but *reliable*." *Daubert*, 509 U.S. at 589 (emphasis added).

1        **a.    *Daubert* Standard**

2           **i.    Reliability**

3        Under the first prong of the *Daubert* analysis, the Court must determine whether the

4    proffered testimony is reliable.  Reliable testimony must be grounded in the methods and

5    procedures of science and signify something beyond "subjective belief or unsupported

6    speculation."  *Daubert*, 509 U.S. at 590.  The inferences or assertions drawn by the expert must be

7    derived by the scientific method.  *Id.*  In essence, the Court must determine whether the expert's

8    work product amounts to "good science."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311,

9    1315 (9th Cir. 1995) ("*Daubert II*") (quoting *Daubert*, 509 U.S. at 593).  In *Daubert*, the Supreme

10   Court outlined a flexible list of factors relevant to the reliability prong, including: (1) whether the

11   theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known

12   or potential rate of error; and (4) whether the theory or methodology employed is generally

13   accepted in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94.

14       A methodology may not be reliable if an expert "fail[s] to address and exclude alternative

15   explanations for the data on which he bases his findings" or "reject[s] studies reporting contrary

16   empirical findings."  *Carnegie Mellon Univ. v. Hoffman–LaRoche, Inc.*, 55 F. Supp. 2d 1024,

17   1034-35 (N.D. Cal. 1999).  In addition, a court may exclude expert testimony on the ground that

18   an expert's purported methodology fails to explain his final conclusion.  *See Joiner*, 522 U.S. at

19   146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to

20   admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A

21   court may conclude that there is simply too great an analytical gap between the data and the

22   opinion proffered.").

23       The essence of Forrester's opinion is that Kinder Morgan's remediation efforts at the

24   Property have been insufficient.  This opinion presupposes that "background conditions" is the

25   proper cleanup standard.  If not, however, then Forrester's opinion is based on an erroneous

26   presupposition, rendering it irrelevant and unreliable.  Thus, before proceeding further, the Court

27   must consider *why* Forrester believes background is the proper cleanup standard.

28       The City's argument in favor of cleanup to background is straightforward: under California

1    Civil Code section 3334(a), in cases of trespass, the wrongful possessor of property must pay the

2    reasonable cost of repairing or restoring the property to its *original condition*.  Cal. Civ. Code

3    § 3334(a).  The City believes the Property enjoyed background conditions prior to petroleum

4    releases; thus, it follows that Kinder Morgan should remediate the Property to that condition.

5         There are several fundamental flaws with this argument.  First, Forrester does not provide

6    adequate scientific analysis demonstrate condition of the Property prior to the releases.  Forrester

7    has not undertaken any tests, or considered any data, to ensure that the Property actually enjoyed

8    background conditions prior to the releases.  Forrester admits he did not know the condition of the

9    groundwater prior to any release from the Mission Valley Terminal, and he did not investigate that

10   factor when determining that the remediation goal should be to background.  [Forrester Dep., Doc.

11   No. 208-3 at 74.]

12        In an attempt to overcome this shortcoming, Forrester stated at his April 12, 2012,

13   deposition that "there are samples results from the data that indicate that [] there are areas where

14   petroleum constituents, even today, are not detected.  So that would give me the indication that

15   historically, apart from the Mission Valley Terminal releases, that the general groundwater quality

16   at the site would be non-detect for petroleum hydrocarbons."  [*Id.* at 74:20-75:5.]  On further

17   examination, however, Forrester admitted he had no data supporting his opinion that the

18   Property's groundwater would not have some level of petroleum contamination prior to Kinder

19   Morgan's releases.  [*Id.* at 75:6-16.]  But in a declaration filed concurrently with the City's

20   Opposition on July 23, 2012, Forrester stated that "data [has] been collected by the Defendant's

21   consultants since December 1986 that have consistently shown areas in . . . the [Mission Valley

22   Terminal] property and in the Off-Terminal area . . . where background conditions exist."

23   [Forrester Decl., Doc. No. 225-1 at 7.]  Regardless of its veracity, this statement does not

24   rehabilitate Forrester's deposition testimony.  Forrester had no factual basis to support his opinion

25   *at the time he created his expert report*.  Indeed, the expert report, completed July 29, 2011,

26   included no data to support Forrester's opinion of the prior condition of the Property, which

27   Forrester admitted during his April 12, 2012 deposition.  As the Court must determine whether

28   Forrester's expert report is admissible, it must consider the facts relied on by Forrester in reaching

the conclusions found therein.  As the above timeline suggests, Forrester had none.  This post hoc style of analysis casts serious doubt on Forrester's opinion.

Next, Forrester does not cite any applicable law which entitles the City to have the land remediated to background, or even state that it is common practice in the remediation industry to remediate to that extent.   Instead, when asked at his deposition why remediation to background is appropriate, Forrester responded:  "[In] [m]y opinion, a landowner has a right to expect that their property, when it's contaminated, would be returned to an *acceptable condition*.  In this case, [the City's] qualification is that it be returned to background . . . ."  [Forrester Dep. at 78 (emphasis added).]  Forrester continues, "in most cases, parties will clean to the level that *they can resolve the matter with the agency*."  [*Id.* (emphasis added).]  In the end, Forrester "believes [] landowners that are impacted should have their day in court and be [] able to have expectations."  [*Id.* (emphasis added).]

Based on the above, the Court finds that Forrester's opinions are based on his personal, subjective opinion that the City should have its expectations met, rather than any authority or scientific principles.  Under *Daubert*, the inferences or assertions drawn by the expert must be derived by the scientific method.  *Daubert*, 509 U.S. at 590.  This did not occur here.  Accordingly, Forrester's adherence to the City's "expectations" as the basis for his opinion cannot reasonably be considered a methodology generally accepted in the relevant scientific community.  On the contrary, all signs–even from Forrester himself–point to a directly opposite finding.  For instance:  (1) never before has Forrester opined that background conditions is the required cleanup standard; (2) the Water Board does not require remediation to background conditions; and (3) Forrester is not aware of any petroleum site in California–or the country for that matter–where the stated goal has been to remediate to background.  [Forrester Dep. at 61:24-62:5.]

The final issue with the reliability of Forrester's opinion is the internal inconsistency found within his testimony.  For instance, his report outlines the Steam Enhanced Extraction ("SEE") technology as the preferred technology to remediate the site.  [*See* Forrester Rep. at 22-23.]  Forrester went so far as to say "a technology such as SEE is the *only type of technology capable of reducing concentrations of both MTBE and TBA to background with a high degree of certainty*

*and in a relatively short period of time*." [*Id.* at 25-26 (emphasis added).]  Yet, as the City acknowledges, Forrester later withdrew his opinion that SEE would be appropriate at the site. [Pl.'s Opp. at 14.]  Certainly, experts may withdraw opinions; however, an expert's written report must contain "a complete statement of all opinions the witness will express and the basis and reasons for them."  Fed. R. Civ. P. 26(a)(2)(B)(i).  Forrester currently opines that Electric Resistance Heating ("ERH") technology should be used to clean the Property.  However, through Forrester briefly mentioned ERH in his report, he did not analyze it or give an overall opinion as to its helpfulness at the Mission Valley Terminal.  What remains, then, is an expert report which claims that Kinder Morgan has improperly remediated the site, without laying out any specific alternative.[2]  Though not singularly fatal, this flaw provides further indicia of the unreliability of Forrester's opinion.

In sum, the Court's task is to ensure that an "expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  In this case, the lack of support for Forrester's opinion indicates that he is not employing the same level of intellectual rigor of someone in his field, as his conclusions are predetermined by unsupported presuppositions.  Therefore, the Court finds that Forrester's report, insofar as it relies on his presupposition that remediation must be to background, is unreliable under *Daubert*.

### ii.    Relevance

The second prong of the *Daubert* analysis requires the Court to consider the relevancy, or "fit" of the expert's proffered testimony.  *Daubert II*, 43 F.3d at 1315 (quoting *Daubert*, 509 U.S. at 597).  In other words, the Court must determine whether the testimony "logically advances a material aspect of the proposing party's case."  *Id.*  Relevancy requires the opinions to assist the trier of fact in reaching a conclusion necessary to the case.  *See Kennedy*, 161 F.3d at 1230;

---

[2]  The City avers that while Forrester set aside his specific recommendation (SEE), he still maintains "thermal heating" technology should be utilized in the cleanup process.  However, Kinder Morgan argues, with no satisfactory response, that "thermal heating" is too broad of a recommendation, and thus too vague to constitute a helpful opinion.

1   *Daubert*, 509 U.S. at 591-92; *Daubert II*, 43 F.3d at 1231 n.17 (relevancy for purposes of *Daubert*

2   is distinct from general relevancy principles under Federal Rule of Evidence 402).

3           Kinder Morgan argues that Forrester's opinion is entirely *irrelevant* as it is "based on the

4   inapplicable criteria that the remediation technologies employed need to meet background for

5   petroleum hydrocarbons." [Defs.' Reply at 1.] The City counters that Forrester's opinion is

6   relevant because the City is entitled to full compensation for the damages that have occurred.

7   Specifically, the City argues that, "[Kinder Morgan] ignores the fact that the City is statutorily

8   entitled to 'the reasonable cost of repair or restoration of the property to its original condition.'"

9   [Pl.'s Opp. at 9 (citing Cal. Civ. Code § 3334(a)).]

10          Because Forrester's opinion has been deemed unreliable, the relevancy of his opinion is

11  minimal. Further, as discussed above, Forrester has not provided sufficient analysis demonstrating

12  that the Property enjoyed background conditions prior to Kinder Morgan's releases. Therefore,

13  the City's claim that Forrester's opinion is relevant to damages puts the cart before the horse: if

14  there is no evidence showing causation, damages need not be considered. In sum, Forrester's

15  testimony is both unreliable and irrelevant.

16                      **b.        Reliability of Opinion 3**

17          Opinion 3 of Forrester's report provides that releases occurred prior to, during, and after

18  2005 that subsequently reached City property. This claim is significant, as several of the City's

19  substantive claims are time-barred absent such evidence. Kinder Morgan argues that this opinion

20  should be excluded as unreliable, based on Forrester's contradictory statements on this issue at

21  different stages of the litigation.

22          For instance, in his July 2011 Expert Report, Forrester states that, "[p]etroleum releases

23  have occurred at the Mission Valley Terminal prior to, during, and since 2005, and will likely

24  continue to occur into the future. These ongoing releases have affected the groundwater and soils

25  on the City of San Diego's property and will likely impact groundwater in the future." [Forrester

26  Rep., Doc. No. 221-7 at 13.]

27          Next, in his Expert Rebuttal Report, dated December 2, 2011, Forrester backs down

28  somewhat from his earlier statement, saying: "It is my opinion that [a contrary expert's opinion

1    that releases *did not* reach the property] . . . cannot be stated with absolute certainty." [Forrester

2    Rebuttal Rep., Doc. No. 208-3 at 182.]

3         Finally, in Forrester's deposition on April 26, 2012, the following exchange occurred:

4    Q.   Okay.  Do you hold any opinions regarding releases that occurred from the Mission
          Valley Terminal that reached the City property from 1994 -- I'm sorry -- 1995 to
5         August of 2004?

6    A.   There were releases described in some of the documents that I read.  *As to whether I
          have an opinion about whether they reached the facility, I don't have direct
7         connection to the fact that they reached the facility.*

8    . . . .

9    Q.   [D]o you hold opinions regarding releases that occurred on the Mission Valley
          Terminal that reached the City's property between 2004 and the present -- I'm sorry
10        -- between August of 2004 and the present?

11   A.   *No.*

     . . . .
12
     Q.   When you say "release," you're talking about some new incident; correct?
13
     A.   That's correct.
14

15   [Forrester Dep., Doc. No. 213-3 at 197-99 (emphasis added).]  Perhaps providing the reason for

16   the inconsistencies, Forrester finally states that he views "any releases from the MVT facility as a

17   release to the Qualcomm property."  He believes so without any supporting evidence that releases

18   actually reached the Property, and despite admitting that many of the releases identified were

19   negligible and occurred some 200 feet away from the Property.  [Forrester Rebuttal Rep. at 13;

20   Forrester Dep. at 195:10-13.]

21        At the motion hearing, the City argued that Forrester's statements are not internally

22   inconsistent, but turn on the nuance that although Forrester did not know *when* the releases

23   occurred on Kinder Morgan's property, he was still certain that releases reached the Property

24   within the applicable time period.  The City's strained interpretation of Forrester's opinion is not

25   convincing.  Forrester explicitly stated that he had no opinion whether releases occurring prior to,

26   during, and after 2005 reached the City's property.

27        To be admitted, expert testimony must reflect "more than subjective belief or unsupported

28   speculation," *Daubert*, 509 U.S. at 590, and must be "based on sufficient facts or data."  Fed. R.

Evid. 702(b).  "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."  *Abarca v. Franklin Cnty. Water Dist.*, 813 F. Supp. 2d 1199, 1204 (E.D. Cal. 2011).  Based on Forrester's ever-evolving opinion, the Court determines that Opinion 3 is not reliable.  Forrester provides no evidence to support his opinion that releases prior to, during, and after 2005 reached the City's property.

### 4.     Conclusion

For the foregoing reasons, the Court **GRANTS** Kinder Morgan's motion and excludes the testimony Ray Forrester under Federal Rule of Evidence 702 and *Daubert*.

**B.     Kinder Morgan's Motion for Partial Summary Judgment on the City's Negligence Claim and Prayer for Punitive Damages**

Kinder Morgan also moves for partial summary judgment on the City's negligence claim and prayer for punitive damages.  The City did not file an opposition and did not provide an explanation for not doing so.  Because Kinder Morgan adequately contends that it is entitled to summary judgment on the negligence claim and prayer for punitive damages, the Court **GRANTS** Kinder Morgan's motion.

### 1.     Negligence Claim

Kinder Morgan argues the City is unable to prove the "causation" element of its negligence claim because the City lacks expert evidence that releases on the Mission Valley Terminal reached the Property.  Thus, Kinder Morgan argues it is entitled to summary judgment because the City cannot establish an essential element of its negligence claim at trial.  The Court agrees.

### a.     Legal Standard

#### i.     Unopposed Summary Judgment Motions

Federal Rule of Civil Procedure 56(e) permits a district court to consider unopposed facts admitted for purposes of the motion and further allows a court to "grant summary judgment if the motion and supporting materials–including the facts considered undisputed–show that the movant

1    is entitled to it." Fed. R. Civ. P. 56(e)(2)-(3).[3]  Summary judgment should not be entered merely

2    because a party fails to file an opposition, and the Court still must analyze whether the moving

3    party adequately contends the absence of triable issues of fact.  *See Henry v. Gill Indus., Inc.*, 983

4    F.2d 943, 950 (9th Cir. 1993); *see also Scarff v. Intuit, Inc.*, 318 Fed. App'x 483, 486 (9th Cir.

5    2008).

6                                    **ii.    Proof of Causation**

7           Under California law, "[t]he elements of an action for negligence are the existence of

8    duty . . . ; breach of duty . . . ; *causation (between the defendant's act or omission and the*

9    *plaintiff's injuries)*; and damages." *Merrill v. Navegar, Inc.*, 28 P.3d 116, 139 (Cal. 2001)

10   (emphasis added).  "[T]he burden falls on the plaintiff to establish causation" in tort cases.

11   *Rutherford v. Owens-Illinois*, 941 P.2d 1203, 1214 (Cal. 1997).

12                              **iii.    When Expert Evidence is Required**

13          "Where the complexity of the causation issue is beyond common experience, expert

14   testimony is required to establish causation." *Garbell v. Conejo Hardwoods, Inc.*, 122 Cal. Rptr.

15   3d 856, 861-62 (Cal. Ct. App. 2011).  "This rule, however, applies only to such facts as are

16   peculiarly within the knowledge of such professional experts and not to facts which may be

17   ascertained by the ordinary use of the senses of a nonexpert." *Easton v. Strassburger*, 199 Cal.

18   Rptr. 383, 393 (Cal. Ct. App. 1984) (citation omitted).

19          In environmental cases, such as this one, laypersons can supply "substantial evidence" if

20   their statements are based on non-technical observations. *McCoy v. Gustafson*, 103 Cal. Rptr. 3d

21   37, 71 (Cal. Ct. App. 2009) ("Statements of area residents who are not environmental experts may

22   qualify as substantial evidence if they are based on relevant personal observations or involve

23   'nontechnical' issues.") (citations omitted).  However, if the matter involves a "complex scientific

24   issue such as the migration of chemicals through land," expert evidence is required.  *Id.*

25                        **b.    Analysis**

26          Kinder Morgan argues that absent expert evidence demonstrating releases on the Mission

27   _____

28          [3] Although Rule 56(e)(1) also permits the Court to "given an opportunity to properly support or address the
     fact," the City has not made a request for leave to file an untimely opposition to Kinder Morgan's motion.

1  Valley Terminal reached the Property, the City cannot establish that Kinder Morgan's allegedly

2  negligent conduct caused injury to the City during the statute of limitations period. The Court first

3  finds that Kinder Morgan has properly characterized what the City must establish to prove

4  causation. The mere fact of a release on the Mission Valley Terminal does not automatically

5  establish injury. Releases could have been minute in volume, may not have penetrated the soil,

6  may have been cleaned immediately, or may have remained on the Mission Valley Terminal

7  without ever reaching the Property. Under such a scenario, the City would not have suffered

8  injury or damages because the releases would not have affected the Property. Thus, to establish

9  causation, the City must be able to demonstrate that the releases actually penetrated the boundary

10  of the Property.

11        Given that the allegedly negligent conduct in question here is the possible subsurface

12  migration of one or more releases on the Mission Valley Terminal, the Court finds that the City

13  must use expert evidence to establish that releases on the Mission Valley Terminal penetrated the

14  boundary of the Property during the statute of limitations period. The migration of subsurface

15  material is not a subject about which laypersons can testify based on their personal observations

16  because the required technical inquiries are beyond the scope of a layperson's experience. *Garbell*

17  *v. Conejo Hardwoods, Inc.*, 122 Cal. Rptr. 3d 856, 861-62 (Cal. Ct. App. 2011). However, there is

18  an absence of expert evidence from which a jury could find causation here, and evidence to the

19  contrary exists. Consequently, Kinder Morgan adequately establishes the absence of a triable

20  issue of fact as to whether releases on the Mission Valley Terminal, if any, caused injury to the

21  City between August 14, 2004, and August 14, 2007.

22        **2.**    **Punitive Damages**

23        The City's prayer for punitive damages is premised on Kinder Morgan's initial polluting

24  conduct and Kinder Morgan's alleged intentional delay and lack of transparency during the

25  cleanup process. Kinder Morgan argues that the City lacks evidence of punishable conduct and

26  that evidence to the contrary exists. The Court finds that Kinder Morgan adequately establishes

27  the absence of triable issues of fact on the City's prayer for punitive damages.

28  / / /

1

### a.     Legal Standard

2       The California Civil Code allows for the award of punitive damages when the City proves

3   "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or

4   malice."  Cal. Civ. Code § 3294(a).  "Something more than the mere commission of a tort is

5   always required for punitive damages.  There must be circumstances of aggravation or outrage,

6   such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a

7   conscious and deliberate disregard of the interests of others that his conduct may be called wilful

8   or wanton."  *Scott v. Phx. Sch., Inc.*, 96 Cal. Rptr. 3d 159, 170 (Cal. Ct. App. 2009) (citation and

9   internal quotations omitted).  Evidence of gross negligence or recklessness is not sufficient.

10  *Flyer's Body Shop Profit Sharing Plan v. Ticor Title Ins. Co.*, 230 Cal. Rptr. 276, 279 (Cal. Ct.

11  App. 1986); *Ebaugh v. Rabkin*, 99 Cal. Rptr. 706, 708 (Cal. Ct. App. 1972) ("There must be an

12  intent to vex, annoy or injure.  Mere spite or ill will is not sufficient; and mere negligence, even

13  gross negligence is not sufficient to justify an award of punitive damages.") (emphasis omitted).

14

### b.     Analysis

15      The mere existence of releases on the Mission Valley Terminal or contamination beneath

16  the Property does not support an award of punitive damages, as releases and contamination alone

17  do not *ipso facto* establish oppression, fraud, or malicious intent.  *See Ticor Title Co.*, 230 Cal.

18  Rptr. at 279.  Moreover, there is no evidence before the Court that Kinder Morgan deliberately

19  misled the Water Board.  To the contrary, the Water Board's outside expert, Dr. Eggers, testified

20  in deposition that Kinder Morgan has cooperated with the Water Board.  Finally, there is no

21  evidence that Kinder Morgan's conduct in addressing the contamination supports the award of

22  punitive damages.  Dr. Eggers testified that she believes Kinder Morgan's efforts have been

23  responsive.  Kinder Morgan adequately establishes the absence of a triable issue of fact as to the

24  City's prayer for punitive damages.

25  ### C.     Kinder Morgan's Motion for Summary Judgment on the City's Water Damages

26      Until the mid-1930s, the City used the Mission Valley basin as a source of water for

27  domestic and agricultural purposes.  In 1936, the City ceased using the basin as a water supply

28  source and has not had an active water supply or storage operation there to date.  Since that time,

the population of the City has grown exponentially, the land above and surrounding the basin has been heavily developed, and a stadium has been built over the Mission Valley aquifer.  Also since that time, myriad complex environmental laws and regulations have been enacted, and the size and complexity of the City government and finances have grown.[4]  The City seeks "loss of use" damages for its purported inability to use the groundwater under the Property for water supply and underground water storage purposes.  The City also seeks damages for "resources extracted without compensation" for Kinder Morgan's extraction of groundwater during its remediation efforts.

**1.      Water Supply Damages**

Kinder Morgan first seeks summary judgment on the City's claim for damages it purportedly sustained from its inability to use the aquifer under the Property as a water supply source.  The City avers that the contamination plume under the Property took the planning, research, and development of any water project "off the table."  Evidence in the record indicates that the City did not believe it could gain public, political, or regulatory support for such a project so long as the groundwater was contaminated, and, as a result, the City opted not to fully plan or develop a water supply project to avoid spending time and resources on a project until the subsurface contamination had been remediated.  However, because the City does not have a ready-to-build water supply project and further lacks expert evidence of a viable water project, Kinder Morgan argues that the City cannot establish the existence of damages because any damages are speculative, merely possible, and contingent on the City actually being able to implement a water project.  As a result, Kinder Morgan argues the City's water damages are barred as a matter of law because they violate the basic tenet of California tort law that a plaintiff cannot recover speculative, merely possible, or contingent damages.

The City counters that Kinder Morgan essentially requires the City to fully plan and implement a water project that it cannot build due to the subsurface contamination under the Property.  The City further avers that it is not required to prove it has a viable water supply project

---

[4]  The Court *sua sponte* takes judicial notice of the facts in the preceding two sentences.  Fed. R. Evid. 201(b)(1)-(2).

07CV1883

1   or do so through the use of expert evidence.  The City argues that the fact that Kinder Morgan

2   delayed the City's development of a water supply project suffices to establish the City's "loss of

3   use" damages.

4   The Court first finds that, under the circumstances of this case, the City must establish that

5   it had a viable or feasible water project.  The Court next finds that the City must do so through the

6   use of expert evidence.  Because the City lacks expert evidence of a viable water project, the Court

7   finds the City's water supply damages are speculative, merely possible, and contingent.  As a

8   result, the Court finds that the City's water damages are barred by California law, and Kinder

9   Morgan is entitled to summary judgment on these damages.

10                      **a.        Legal Standard**

11   "Whatever the proper measure of damages may be, in a given case, the recovery therefor is

12   still subject to the fundamental rule that damages which are speculative, remote, imaginary,

13   contingent, or merely possible cannot serve as a legal basis for recovery."  *Lueter v. Cal.*, 115 Cal.

14   Rptr. 2d 68, 81 (Cal. Ct. App. 2002) (internal quotations and citations omitted); *see Piscitelli v.*

15   *Friedenberg*, 105 Cal. Rptr. 2d 88, 114 (Cal. Ct. App. 2001) (plaintiff must prove benefits

16   "reasonably certain to have been realized" but for defendant's wrongful conduct).  Damages are

17   speculative when they depend "on the act of a third person or the happening of a certain

18   event . . . ."  *Agnew v. Parks*, 343 P.2d 118, 125 (Cal. Ct. App. 1959) (citing *McQuilkin v. Postal*

19   *Tel. Cable Co.*, 151 P. 21, 22 (Cal. Ct. App. 1915)).

20                      **b.        The City Must Establish It Had a Viable or Feasible Water Project**

21   The City is correct that no authority *specifically and expressly* requires the City to prove

22   that it had a viable, implementable water project.  However, the general rule that damages cannot

23   be speculative, contingent, or merely possible governs *every* tort case.  This general rule is the

24   driving force behind Kinder Morgan's argument.  In general, the City bears the burden of proving

25   all of the elements of its tort claims, including that the City actually suffered damages.  The logic

26   of Kinder Morgan's argument is as follows:  if the City did not have a viable water project it could

27   have implemented, Kinder Morgan's conduct did not cause the City's inability to proceed with a

28   water project because the City may never have done so, or been able to do so, anyway.  For

1  example, if the City was prevented from using the aquifer due to technical or environmental

2  reasons, then the City suffered no damages despite Kinder Morgan's conduct.  Or, if the City

3  chose not to build the project (*e.g.*, for fiscal or political reasons), then again, the City did not

4  suffer damages attributable to Kinder Morgan.  Consequently, whether the City suffered damages

5  from having its water project delayed is speculative, merely possible, and contingent on the City's

6  *ability* to actually build a water project in the first place.  In the Court's estimation, the City could

7  have cured the speculative nature of its water damages by either presenting a fully-developed,

8  ready-to-build water project that has passed all technical, regulatory, political, and fiscal hurdles

9  *or* by proffering evidence that a water project on the Property is viable and could be implemented.[5]

10        The City asserts it does not have to establish that it had a viable project and only needs to

11  prove Kinder Morgan's conduct resulted in a "loss of use," which the City can prove by the mere

12  fact of delay.  However, this position disregards whether the City was *able* to use the aquifer.

13  Based on the evidence before the Court, the City currently does not know whether it can use the

14  aquifer, only that it *wants* to use it.  The City has not used the Mission Valley aquifer for drinking

15  water purposes since 1936, has had no operational water supply wells in the ground since that

16  time, has no comprehensive water project developed, and has not performed any feasibility studies

17  to determine whether such a project could actually be implemented.  Moreover, the fact that the

18  City once used the Mission Valley Basin as a water supply source in 1936 is not particularly

19  probative of the City's present-day ability to do so.  Since that time, the population of the City has

20  grown exponentially, the area over and around the Basin has been developed for commercial and

21  residential purposes, numerous new environmental and regulatory rules and laws have been

22  enacted, a stadium was built on top of the aquifer, and the size and complexity of the City

23  government and fiscal situation has changed significantly.

24  _____

25        [5]  At oral argument, the City expressed confusion about language in the tentative ruling that seemingly
contradicted the Court's explanation that Kinder Morgan does not argue that the City is required to build a ready-to-

26  build water project.  However, this discussion is not contradictory.  *In the absence of* the evidence of a ready-to-build
water project, Kinder Morgan argues that the City must show that it could have someday built a feasible project to

27  bridge the "speculative, merely possible, or contingent" gap between Kinder Morgan's conduct and the existence of
damages.  Kinder Morgan argues the City could bridge this gap with expert evidence.  The Court's ruling is not based

28  on the City's lack of a ready-to-build project but the lack of expert evidence of a feasible project *in the absence* of
evidence of a ready-to-build project.

07CV1883

1        The Court concludes that the City's ability to establish the existence of a feasible water

2   project is critical because it provides the missing conceptual link between Kinder Morgan's

3   conduct and the existence of damages.  This case is not one in which Kinder Morgan's discharges

4   polluted the City's *existing* water wells, thus preventing the City from continuing groundwater

5   extraction and storage.  Such a scenario would present a more direct link between Kinder

6   Morgan's conduct and the City's damages.  Where the City has no wells in the ground, no viable

7   project planned or designed, no evidence that the project could be viable, and no evidence that the

8   project would pass regulatory, fiscal, and political muster or receive the required permits, the

9   connection between Kinder Morgan's conduct and any damages is speculative and based on

10  multiple contingencies.

11       The City relies on *Shamsian v. Atl. Richfield Co.*, 132 Cal. Rptr. 2d 635 (Cal. Ct. App.

12  2003), for the proposition that (1) "loss of use" is a recognized measure of continuing nuisance

13  damages, and (2) the City is not "required to ignore contamination in order to mitigate its

14  damages."  The City argues it is incorrect to say that the City "must have gone forward with the

15  groundwater extractions system notwithstanding the presence of Defendants' contamination, in

16  order to recover damages."  As explained below, *Shamsian* is not analogous to the City's case, and

17  the City's second argument misses the point of Kinder Morgan's position.

18       First, *Shamsian* stands for the general proposition that, "[a]nything which is . . . an

19  obstruction to the free use of property is a nuisance."  *Id.* at 644.  However, this rule does not

20  relieve the City from the burden of proving non-speculative damages.  The City's case is

21  distinguishable from *Shamsian*.  The *Shamsian* plaintiffs' ability to use the property as they

22  wished or intended was not in question because they were in the process of digging to install new

23  underground storage tanks and were forced to stop when they discovered the subsurface

24  contamination.  *See id.* at 641  ("When the appellants' contractor began installing new

25  underground storage tanks, he discovered a strong odor and discolored soil.").  Thus, it appears the

26  *Shamsian* plaintiffs could have installed the tanks but for the defendant's conduct.  It was in that

27  context that the court stated:  "The respondents argue that any loss of use was due to the

28  appellants' voluntary decision to put a hold on developing the property.  However, we decline the

respondents' implied invitation to hold that the appellants were obligated to ignore the contamination in order to mitigate their damages." *Id.* at 647.  Here, however, the City's ability to use the aquifer as it wishes is in question because of the lack of active water operations and viable plans.  Thus, the general statement of law in *Shamsian* is unhelpful and does not weaken Kinder Morgan's argument.

Second, the City misses the point of Kinder Morgan's argument when it argues that it did not have to build a water project in order to mitigate damages.  Kinder Morgan does not suggest that the City should have gone forward and actually conducted the various technical studies, drafted blueprints, and spent money to develop an actual water project that was ready for groundbreaking.  Nor does Kinder Morgan argue that the City had to build a water project despite the contamination in order to mitigate damages.  Kinder Morgan's actual position is properly characterized as follows:  the City lacks evidence that it ever *could have* gone forward with a water project; consequently, its damages are speculative and contingent because the project may never have gained regulatory approval or the City might have chosen not to proceed with it in light of the high costs and comparatively low benefits.

Ultimately, based on the basic tenet of California law that claimed damages cannot be speculative, contingent, or merely possible, the City must prove, as part of its burden to establish the elements of nuisance and trespass, that it had a viable water project which could have proceeded but for Kinder Morgan's conduct.

### c.      Expert Evidence

The Court next finds that the technically complex analysis required to establish the existence of a viable water project can only be provided by an expert witness.  Where matters involve technical analysis that is not within the common knowledge of the layperson, expert evidence is necessary.  Because the evidence the City must proffer to establish that the water project could have gone forward is complex, technical, or both, it is solely within the knowledge of experts.  Therefore, the City must use expert evidence to establish its water damages.

### d.      The City Lacks Expert Evidence of a Viable Water Project

The City can meet its evidentiary burden through expert evidence that a water project

07CV1883

would pass technical, regulatory, political, and fiscal challenges.  Such evidence would help the City overcome the fact that it lacked an active water operation that Kinder Morgan disrupted and the fact that the only "project" the City currently has is a 2004 Concept Study, which is an incomplete, conceptual project that the City may never be able to implement.

The City's theory of the case simply *assumes* that it could and would have gone forward with a water project.  However, such an assumption cannot be made here because of the many obstacles a potential water project must overcome before being implemented.  The only "project" the City has is the 2004 Concept Study by Dr. Welch.  However, as Dr. Welch explains, this project is a general "10,000-foot" view of a possible water project.  His study was incomplete and was not a final water project plan that could go forward but for Kinder Morgan's conduct. Dr. Welch testified at deposition that the City would have to engage in the following activities to determine if the "conceptual desalter project" in the 2004 Concept Study is viable:

1.    environmental studies;

2.    engineering studies;

3.    geotechnical studies;

4.    investigation of the depth of the alluvial material from which the City claims it could withdraw water;

5.    the number, size, and specifications of wells required;

6.    the location of the wells;

7.    the location of the required water treatment plant;

8.    the "sustainable" yield of the aquifer;

9.    flooding issues, given that portions of the property are located within the flood plain;

10.    the kind of treatment that would be required;

11.    the available treatment technology;

12.    the water quality of the aquifer;

13.    the availability of permits from other government agencies;

14.    land use restrictions;

15.    potential impacts on the San Diego River, as well as species and vegetation;

16.     requirements under the California Environmental Quality Act ("CEQA"); and

17.     the cost of the project.[6]

As Kinder Morgan points out, "[t]he City has not conducted any of these studies, nor has it offered expert testimony of the likely outcome of any of these studies.  The outcome of any of these studies could scuttle or delay the theoretical project, or significantly increase the costs."  [Defs.' Mot. at 8.]  Based on the evidence before the Court, the City does not know whether any water project was technically, politically, or fiscally possible on the Property, whether it ever could have funded the project, or whether the political process would have approved the project at a certain cost.  The City simply argues that it was pointless to undertake any of these tasks so long as the groundwater was contaminated.  The City could have met its burden to establish the existence of non-speculative damages by retaining one or more experts to opine on these factors and to conclude that the water project was viable.[7]  However, the City lacks expert evidence on this issue and, as a result, cannot establish that it could have implemented a feasible water project in light of the myriad technical, regulatory, political, and fiscal tests such a project would need to pass.

Ultimately, the link between Kinder Morgan's conduct (petroleum discharges) and the City's water damages and injury (inability to use the Mission Valley basin for water extraction and storage) is speculative, merely possible, and contingent.  The City could decide to abandon its water project after it conducts the necessary tests, could be unable to finance the project, could

---

[6] This is an important factor, and Kinder Morgan's expert, Johnathan Shefftz, opined as follows:

My opinion is that the City of San Diego and its water department were severely financially constrained from about the middle of 2004 into about the middle of 2009 as a result of a financial crisis that originally arose from a pension fund scandal, but affected the water department in terms of being unable to obtain financing, long-term financing from public bond markets.
. . . .
Because of that situation, it is highly unlikely that the City would have been able to proceed with either of the projects proposed to various extents, uh, in Mission Valley.

Thus, without an expert's opinion on the estimated final cost of the project, whether the City could fund the project, and whether the City Council would approve a project with such a cost, it is impossible to know if the project was viable.  In other words, the City's damage are *contingent upon* the existence of a viable project, which must garner political approval and be able to be financed.

[7] The Court notes that some of the City's experts comment on these topics in their rebuttal reports, but the City has not proffered any expert witness report which evaluates a water storage and supply project and expressly opines that such a project is viable.

1    have difficulty during the political approval process, or could decide that the project is not feasible

2    after all.  Further, if the City could not obtain permits or gain regulatory approval, the water

3    project would never be implemented.  Under these circumstances, the City would not have

4    suffered damages because the City could not have used the basin for water extraction and storage

5    in any event.  Because the City lacks evidence of a viable water project, it cannot establish at trial

6    that its damages comply with the basic tenet of California law against speculative, merely possible,

7    or contingent damages.

8              **2.      Water Storage Damages**

9              Kinder Morgan also seeks summary judgment on the second component of the City's

10   groundwater damages for the City's purported inability to use the aquifer under the Property for

11   underground water storage purposes.  Kinder Morgan is entitled to summary judgment on the

12   City's water storage damages because the City lacks evidence of a viable water supply project.  It

13   is undisputed that a groundwater storage project cannot exist without a water supply project in

14   place.  However, as explained above, the City does not have evidence that it has a viable water

15   supply project.  Because the City cannot establish the existence of water supply damages at trial, it

16   likewise cannot establish the existence of water storage damages.  As a result, Kinder Morgan is

17   entitled to summary judgment on this damages claim as well.

18             **3.      Resources Extracted Without Compensation**

19             Kinder Morgan also seeks summary judgment on the City's claim for over $570,000 in

20   damages for "resources extracted without compensation."  Under this damages theory, the City

21   claims Kinder Morgan is required to pay $390 per acre-foot of water Kinder Morgan pumped and

22   treated pursuant to the Water Board's orders.  The City's claim for damages for "resources

23   extracted" is distinguishable from its claimed damages for the *inability to use* the water in the

24   aquifer.  The City seeks payment for the *actual* water Kinder Morgan extracted from the ground as

25   part of the remediation efforts.  Kinder Morgan argues that the City abandoned this damages claim

26   when it failed to oppose Kinder Morgan's motion.  Kinder Morgan further argues that the City is

27   not legally entitled to these damages.

28             The Court first finds that Kinder Morgan is entitled to summary judgment on this damages

claim because the City abandoned the claim when it failed to oppose Kinder Morgan's motion on this ground.  *Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011); *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005).  However, Kinder Morgan would be entitled to summary judgment even if the City had addressed it.  Setting aside that the City's "resources extracted without compensation" damages claim appears to flow from an unalleged conversion claim,[8] these damages fail as a matter of law under the circumstances of this case.

"The tort of conversion applies to personal property, not real property."  *Salma v. Capon*, 74 Cal. Rptr. 3d 873, 889 (Cal. Ct. App. 2008); *see Fremont Indem. Co. v. Fremont Gen. Corp.*, 55 Cal. Rptr. 3d 621, 638 (Cal. Ct. App. 2007).  Water rights are a species of real property, not personal property.  *See Locke v. Yorba Irrigation Co.*, 217 P.2d 425, 429 (Cal. 1950) ("Water rights are a species of real property capable of acquisition by adverse user.")  Moreover, the tort of conversion does not extend to intangible rights in real property.  *Kremen v. Cohen*, 337 F.3d 1024, 1031 n.7 (9th Cir. 2002).  In California, the City cannot own groundwater as property and at best can have a "non-exclusive right to use the groundwater."  *See* Cal. Water Code § 102 ("All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law.").  A conversion claim fails as a matter of law for two reasons.  First, because the City cannot own the water in the basin, Kinder Morgan did not convert any of *the City's* property.  Second, water rights are not property rights that can be subject to conversion claims because they are *real* property rights, not *personal* property rights.  Kinder Morgan is entitled to summary judgment on the City's damages claim for "resources extracted without compensation."

/ / /

/ / /

---

[8]  Under California law, the City may recover damages under its continuing nuisance and continuing trespass theories for "lost use," and for "annoyance, inconvenience, and discomfort caused" by the nuisance and trespass. *McCoy v. Gustafson*, 103 Cal. Rptr. 3d 37, 58 (Cal. Ct. App. 2009); *see also* Jud. Council of Cal. Civ. Jury Instructions ("CACI") 2031.  Conversion "is the wrongful exercise of dominion over another's personal property in denial of or inconsistent with his rights in the property."  *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003).  Thus, a claim of damages for "resources extracted without compensation" most closely resembles the measure of damages City might be entitled to under a conversion claim.  *See Moreno v. Greenwood Auto Ctr.*, 110 Cal. Rptr. 2d 177, 183 (Cal. Ct. App. 2001).

- 25 -

1

**D.     Kinder Morgan's Motion for Summary Judgment on the City's Real Estate and Restoration Damages**

2

3     The City also seeks $246 million in real estate and restoration damages.  According to the

4  City, it is entitled to these damages because (1) under California Civil Code section 3334, the City

5  is entitled to the reasonable rental value of the Property at its "highest and best use"–a mixed-use

6  property–estimated at $120 million, and (2) the current remediation efforts by Kinder Morgan will

7  not sufficiently remediate the property to background conditions, resulting in $126 million of

8  future restoration damages.  Kinder Morgan seeks partial summary judgment on these damages.

9  For the following reasons, the Court **GRANTS** Kinder Morgan's motion.

10     **1.     Real Estate Damages**

11     The City's real estate damages expert, Randall Bell, opines that the rental value of the

12  City's property at its "highest and best use" (a mixed-use facility) is $120 million.  [Bell Rep.,

13  Doc. No. 207-3 at 55.]  Kinder Morgan asserts that the City has no right to receive "highest and

14  best use" rental value, and that the damages estimate is impermissibly speculative.

15          **a.     Relevant Law**

16     Generally, "[t]he measure of damages suffered by reason of a tortious act is the amount

17  which will compensate for all the detriment proximately caused thereby whether it could have

18  been anticipated or not."  Cal. Civ. Code § 3333.  A party claiming damage must prove it has

19  suffered damage with reasonable certainty.  *Chaparkas v. Webb*, 2 Cal. Rptr. 879, 880 (Cal. Ct.

20  App. 1960).  "Uncertainty as to the fact of damage, that is, as to the nature, existence or cause of

21  the damage is fatal."  *Page v. Bakersfield Uniform Towel & Supply Co.*, 49 Cal. Rptr. 46, 54 (Cal.

22  Ct. App. 1966) (internal citations and quotations omitted).

23     In California, when a subsurface trespass involves a wrongful occupation of land, Civil

24  Code section 3334(a) sets out the proper measure of damages.  *See Cassinos v. Union Oil Co.*, 18

25  Cal. Rptr. 2d 574, 579 (Cal. Ct. App. 1993); *Starrh and Starrh Cotton Growers v. Aera Energy*

26  *LLC*, 63 Cal. Rptr. 3d 165, 176 (Cal. Ct. App. 2007) ("In California, when the trespass involves a

27  wrongful occupation of land, Civil Code section 3334, subdivision (a), sets out the proper measure

28  of damages–including damages for a subsurface trespass.").  Section 3334 provides:

1       (a) The detriment caused by the wrongful occupation of real property . . . is deemed
2   to include the value of the use of the property for the time of that wrongful
    occupation, . . . the reasonable cost of repair or restoration of the property to its
3   original condition, and the costs, if any, of recovering the possession.

    [¶]
4
    (b)(1) Except as provided in paragraph (2), for purposes of subdivision (a), the
5   value of the use of the property shall be the greater of the reasonable rental value of
    that property or the benefits obtained by the person wrongfully occupying the
6   property by reason of that wrongful occupation.

7   Cal. Civ. Code § 3334.[9]

8           **b.**    **Analysis**

9        The City contends that, under section 3334, it is entitled to rental value of the land at its

10  "highest and best use," and states it is irrelevant whether it could or would have redeveloped the

11  property to this use, as section 3334 damages do not depend on a plaintiff's actual or intended use

12  of the subject property.  [Pl.'s Opp. at 13.]

13       Tellingly, to support its "highest and best use" theory, the City cites an eminent domain

14  case–not a section 3334 case involving trespass or nuisance.  [Pl.'s Opp. at 14 (citing *San Diego*

15  *Metro. Transit Dev. Bd. v. Cushman*, 62 Cal. Rptr. 2d 121, 122 (Cal. Ct. App. 1997)).]  It is well

16  settled that in eminent domain proceedings, the measure of just compensation is the fair market

17  value of the property, and "[i]n order to determine the fair market value of a property being

18  condemned in an eminent domain proceeding, there must be a determination of the highest and

19  best use to which the property being condemned can be put."  *City of San Diego v. Rancho*

20  *Penasquitos P'ship*, 130 Cal. Rptr. 2d 108, 119 (Cal. Ct. App. 2003) (quotations omitted).

21  However, this Court is aware of no authority, nor does the City cite any, which awards a

22  hypothetical "highest and best use" damages amount under section 3334.

23       Instead, under section 3334, "[t]he measure of damages for the wrongful occupation of

24

25

26       [9]  Kinder Morgan contends that section 3334 is inapplicable here because it only applies in cases of
*intentional* wrongful occupation.  Kinder Morgan fails, however, to cite any law to support this proposition.  A review
of the statutory language and case law shows that Kinder Morgan's argument lacks merit and that section 3334 is
27  indeed the applicable statute to consider damages for a subsurface trespass, whether intentional or not.  *See, e.g.*,
*Bailey v. Outdoor Media Group*, 66 Cal. Rptr. 3d 322, 329 (Cal. Ct. App. 2007) ("As set out above, section 3334,
28  subdivision (b) specifies the 'mild' measure of damage that applies when the trespass is the result of a mistake of fact,
and therefore is unintentional or inadvertent.  In that situation damages are measured by the reasonable rental value of
the property.")

07CV1883

land is the value of its use *during the time of such occupation*." *S. Pac. Land Co. v. Meserve*, 198 P. 1055, 1057 (Cal. 1921) (emphasis added). In *Meserve*, the plaintiff contended that he should be entitled to recover damages for the wrongful use of his desert land by the defendant measured by the rental value of the land with water on it. The facts showed that water in this area could only be obtained through stock ownership in the local water company. The defendant was a stockholder, but the plaintiff was not. The court concluded that the plaintiff's recovery must be limited to the rental value of the land alone, and not measured by the value of the land with an available source of water. *Id.*

Undoubtedly, the land at its "highest and best use" in *Meserve* included an available water source. *See id.* ("It is obvious, however, from the circumstances that the use of the land was of no value without water, and, as water was not available from any other source, that the water stock would probably be worth as much as the land."). However, because a water source was not present at the time of the wrongful occupation, the court refused to assign a higher rental value by including a hypothetical water source. Instead, the court awarded the rental value of the land as it existed at the time of the wrongful occupation. The same principle applies here: the City is only entitled to the rental value of its land as it existed during the time of Kinder Morgan's alleged wrongful occupation. At the time of the alleged occupation, the City used the property as a stadium.

The City cites several cases to support the assertion that section 3334 damages may include hypothetical "highest and best use" rental damages. These cases are unpersuasive. For instance, the City cites *Don v. Trojan Construction Co.*, 2 Cal. Rptr. 626 (Cal. Ct. App. 1960), for the proposition that damages for trespass and nuisance are not dependent upon the plaintiff's actual use or intended use of the property. [Pl.'s Opp. at 13.] In *Don*, the defendant dumped dirt on the plaintiff's vacant lot without permission. The plaintiff sued for trespass and nuisance. However, the plaintiff did not intend to rent out the property and would not have rented it out even had an offer to rent been made. Nonetheless, the Court of Appeal awarded the plaintiff "value of the use" damages, citing section 3334. *Id.* at 629. As the City points out, the damages awarded were based on the "highest rental use" of the property. Nonetheless, while the court awarded "highest rental

use" damages, this award was directly related to the *actual status* of the land at the time of the wrongful occupation.  Indeed, the "highest rental use" of the *empty lot* was determined to be storing heavy equipment.  *Id.* at 628.  This counters the City's claim that it may hypothesize an entirely new use for its property, and then be awarded rental damages for that hypothetical use.  Thus, *Don* fails to support the City's damages theory.  On the contrary, *Don* highlights the fact that damages for wrongful occupation can only be awarded commensurate with the status of the land at the time of the occupation.

Next, the City cites *Spaulding v. Cameron*, 274 P.2d 177 (Cal. Ct. App. 1954), for the proposition that "[t]he use of the property by a plaintiff, or lack thereof, during the course of the trespass and/or nuisance does not limit or foreclose the availability of damages for trespass and nuisance."  [Pl.'s Opp. at 9.]  In *Spaulding*, the rental value of the plaintiff's house was diminished by $2,160 per year when loose dirt from a neighbor's lot washed onto plaintiff's property, causing damage to her home.  Among other arguments, the defendant claimed that because the plaintiff lived in the house herself, she could not claim damages for lost rental value.  The court disagreed and held:  "Although [the plaintiff] remained in the house, her loss was a real one; if the rental value was diminished at the rate of $2,160 per year while the nuisance existed, the value of the use of the premises to plaintiff while she occupied them was likewise diminished."  *Id.* at 182.

*Spaulding* is no more helpful to the City than *Don*.  Unlike in *Spaulding*, the City is attempting to recover the hypothetical rental value of the Property.  Thus, it cannot demonstrate it has suffered a *real loss*.  The City does not provide any evidence that the land in its present state decreased in rental value, likely because the City has collected rent under its existing leases on the lot, and has not lost any revenue due to the contamination or remediation efforts.  Further, the City has never cancelled or interrupted any other use of the Property due to the contamination or remediation, including college football games, Monster Jam or Supercross events, or Major League Soccer games.  [Defs.' Statement of Undisputed Facts at 7.]

At the motion hearing, the City also cited *United States v. Bernard*, 202 F. 728 (9th Cir. 1913), in support of its argument.  There, the defendants fenced in and grazed their cattle on public land.  Defendant argued that the government would not have used the land, and so suffered no

damages.  *Id.* at 731.  The court disagreed, holding that "[t]he fact that a plaintiff in an action for continued trespass would have made no use of the land which the defendant has wrongfully used to his advantage and profit will not prevent the plaintiff from recovering the actual value of that which has been so used and acquired by the defendant."  *Id.*  Nothing in *Bernard* suggests that a plaintiff can hypothetically redevelop his property to its "highest and best use" and then recover rental damages based on that hypothetical redevelopment.  Instead, *Bernard* merely held that a wrongful occupier must pay the rental value of the land he occupies, regardless of whether the plaintiff used the land at the time of the occupation.  This unremarkable proposition does not support the City's theory of damages.

Finally, at the motion hearing, the City also cited *Guttinger v. Calaveras*, 233 P.2d 914 (Cal. Ct. App. 1951), and *United States v. Imperial Irr. Dist.*, 799 F. Supp. 1052 (S.D. Cal. 1992).  The Court finds that these cases do not involve section 3334 and therefore do not apply.

In sum, the City has no legal basis to claim $120 million in real estate damages.  This number is based entirely on a hypothetical "highest and best use" of the City's property, while section 3334 only provides for damages equal to the rental value of the land as it existed at the time of the wrongful occupation.  The City requested that the Court allow a jury to decide the rental value of the property occupied by Kinder Morgan.  The City posited that rental value would be roughly $35 million a year based on a stadium rental of $100,000 per day.  However, the City has not suffered any loss of use of the stadium, and has recovered all rents due on the Property.  Any further recovery of rent would then amount to a double recovery never before awarded under section 3334.  Furthermore, Kinder Morgan did not wrongfully occupy the *stadium*, it allegedly wrongfully occupied the subsurface *beneath the stadium*.  Thus, there is no basis to award the City the rental value of the stadium.  For all of these reasons, the Court **GRANTS** Kinder Morgan's motion for summary judgment with respect to the City's alleged real estate damages.

**2.  Restoration Damages**

The City's restoration damages estimate of $126 million rests entirely on the testimony of its expert, Ray Forrester.  As explained previously, the Court has excluded Forrester's testimony on the grounds that it is unreliable.  Accordingly, the City has no evidence to support its claim for

1  $126 million in restoration damages.  Therefore, the Court **GRANTS** Kinder Morgan's motion for

2  summary judgment with respect to the City's alleged restoration damages.

3  **E.      The City's Motion for Summary Judgment Regarding Trespass and Nuisance**

4           The City moves for partial summary judgment on its nuisance and trespass claims.  In

5  response, Kinder Morgan first opposes the City's motion on the merits, then asks the Court to

6  enter summary judgment on the City's trespass and nuisance claims in favor of Kinder Morgan

7  pursuant to Federal Rule of Civil Procedure 56(f), which allows the Court to do so upon notice to

8  the City and an opportunity to respond.  Kinder Morgan's request is based on the City's failure to

9  establish that its nuisance and trespass claims are "continuing,"as opposed to "permanent," and

10 that these claims are time-barred as a result.  Unless the City first satisfies its burden to show that

11 its claims are not time-barred, the three-year statute of limitations bars its private nuisance and

12 trespass claims.  The City has not made such a showing and further lacks evidence from which a

13 jury may conclude that the City's claims are continuing.  Moreover, the City and the People of the

14 State of California lack evidence to establish their public nuisance claims.  Kinder Morgan is

15 entitled to summary judgment on the private nuisance, public nuisance, and trespass claims.

16           **1.      The Statute of Limitations Bars the City's Trespass and Private Nuisance**
                 **Claims**

17

18           Both sides recognize that the three-year statute of limitations for nuisance and trespass

19 claims may bar the City's claims under the circumstances of this case.  Thus, before presenting

20 evidence to support its nuisance and trespass claims, the City must establish that its nuisance and

21 trespass claims are "continuing" so that its claims are not barred by the statute of limitations.  To

22 do so, the City must present evidence that the condition beneath the Property is "abatable" as

23 defined by California courts.  However, the City lacks such evidence, and consequently, its claims

24 must be deemed "permanent" and time-barred.  This conclusion renders the City's partial

25 summary judgment motion moot.

26           **a.      Kinder Morgan's Request For Summary Judgment Under Rule 56(f)**

27           In its opposition brief, Kinder Morgan states that the City's own theory of the case shows

28 that its private nuisance and trespass claims are barred by the statute of limitations.  In addition to

1   the claims being time-barred, Kinder Morgan argues that the City lacks evidence to establish

2   certain elements of its nuisance and trespass claims.  As a result, Kinder Morgan asks the Court to

3   enter judgment in its favor pursuant to Federal Rule of Civil Procedure 56(f).  The City protests

4   that Kinder Morgan is trying to circumvent the motion filing deadline by asking for summary

5   judgment in an opposition brief.  The City does not argue that Kinder Morgan *cannot* do so, but

6   asks that the Court reject Kinder Morgan's request.  Nonetheless, in its reply brief, the City

7   responds to Kinder Morgan's substantive arguments.

8           District courts possess the power to enter summary judgment *sua sponte*.  *See Celotex*

9   *Corp. v. Catrett*, 477 U.S. 317, 326 (1986).  Further, Rule 56(f)(1) provides that, after giving

10  notice and a reasonable time to respond, the Court may grant summary judgment in favor of a

11  nonmovant.  The key consideration is whether the party against whom judgment was entered had

12  proper notice of the possible judgment against him:  "The party against whom summary judgment

13  is entered must have notice that the court is considering dropping the ax on him before it actually

14  falls."  *Goldstein v. Fidelity & Guar. Ins. Underwriters, Inc.*, 86 F.3d 749, 750 (7th Cir. 1996); *see*

15  *also First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir. 1999) (a

16  "court may grant summary judgment to a non-moving party, provided that party has had a full and

17  fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried.").

18          Here, the City has received sufficient notice of a possible judgment against it on statute of

19  limitations grounds and has had a full and fair opportunity to respond to Kinder Morgan's

20  arguments.  This is demonstrated most plainly by the fact that the City responded in its reply brief

21  to Kinder Morgan's substantive arguments and has had notice of the statute of limitations issue for

22  several years.  The City does not contest that the Court has the authority to enter judgment against

23  it in this circumstance, but simply asks the Court to refrain from doing so.  Given the procedural

24  posture of the case, the Court finds it appropriate to consider Kinder Morgan's request at this time.

25          **b.     Legal Standard:  Continuing Versus Permanent Nuisance and Trespass**

26          California Civil Code section 3479 defines a nuisance as, "[a]nything which is injurious to

27  health, including . . . an obstruction to the free use of property, so as to interfere with the

28  comfortable enjoyment of life or property."  "A nuisance may be a public nuisance, a private

nuisance, or both." *Newhall Land & Farming Co. v. Superior Court*, 23 Cal. Rptr. 2d 377, 380 (Cal. Ct. App. 1993).  "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."  Cal. Civ. Code § 3480.

"California's definition of trespass is considerably narrower than its definition of nuisance. A trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it." *Capogeannis v. Superior Court*, 15 Cal. Rptr. 2d 796, 799 (Cal. Ct. App. 1993).  "A trespass may be committed by the continued presence on the land of a structure, chattel, or other thing which the actor has tortiously placed there, whether or not the actor has the ability to remove it.  Under this definition, 'tortious conduct' denotes that conduct, whether of act or omission, which subjects the actor to liability under the principles of the law of torts."  *Newhall Land & Farming Co.*, 23 Cal. Rptr. 2d at 383 (internal quotations and citation omitted).

The statute of limitations for trespass and private nuisance claims is three years and begins to run upon the creation of the trespass or nuisance.  *Holdgrafer v. Unocal Corp.*, 73 Cal. Rptr. 3d 216, 231 (Cal. Ct. App. 2008); *see also Mangini v. Aerojet-Gen. Corp.*, 912 P.2d 1220, 1223 (Cal. 1996).  However, "[t]here is an exception to the statute of limitations for certain trespass and nuisance claims.  Where a plaintiff can show that its claim is a 'continuing' violation, the statute of limitation serves only to limit damages to those incurred in the three-year period before the suit was filed."  *Skokomish Indian Tribe v. United States*, 401 F.3d 979, 991-92 (9th Cir. 2005) (internal quotations and citations omitted).

There is no all-purpose test for determining whether a particular nuisance is continuing or permanent.  California courts have developed several factors that generally govern resolution of the issue and whether the statute of limitations applies to a cause of action depends on the particular facts and circumstances of each case.  *Beck Dev. Co. v. S. Pac. Transp. Co.*, 52 Cal. Rptr. 2d 518, 557, 560 (Cal Ct. App. 1996).  But generally, a nuisance is continuing if the condition is "abatable," meaning that it "can be remedied at a reasonable cost by reasonable means."  *Mangini*, 912 P.2d at 1229.

As the California Court of Appeal has explained, "[o]ver the years a number of tests have

developed to determine the true nature of a trespass." *Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 63 Cal. Rptr. 3d 165, 172 (Cal. Ct. App. 2007); *see also Beck Dev. Co.*, 52 Cal. Rptr. 2d at 557 ("[D]ecisional authorities have identified various 'tests' emphasizing different factors which may be considered."). The three main tests are:

(1)   Whether the offense activity is currently continuing, which indicates that the nuisance is continuing,

(2)   whether the impact of the condition will vary over time, indicating a continuing nuisance, or

(3)   whether the nuisance can be abated at any time, in a reasonable manner and for reasonable cost, and is feasible by comparison of the benefits and detriments to be gained by abatement.

*Starrh & Starrh Cotton Growers*, 63 Cal. Rptr. 3d at 172 (citation omitted).

These same principles apply equally to claims for trespass and nuisance. *Mangini v. Aerojet-Gen. Corp.*, 281 Cal. Rptr. 827, 842 (Cal. Ct. App. 1991). In cases where the statute of limitations presents a bar to recovery on trespass and nuisance claims, whether a nuisance or trespass is abatable is an element that the plaintiff must affirmatively establish. *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053, 1072 n.21 (C.D. Cal. 2003) ("Although abatability might be viewed as an element of Defendants' statute of limitations affirmative defense, those California courts that have addressed the issue have viewed the continuing (*i.e.* abatable) nature of a nuisance as an element of the plaintiff's case.").

"Whether contamination by toxic waste is a permanent or continuing injury is ordinarily a question of fact turning on the nature and extent of the contamination." *Mangini*, 281 Cal. Rptr. at 841. However, where a party cannot produce "substantial evidence" that the harm is capable of being abated by reasonable means at reasonable cost, the nuisance *must* be deemed permanent by the Court. *Mangini*, 912 P.2d at 1221.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

c.     **Whether the Offense Activity is Currently Continuing**[10]

The City contends that the mere existence or presence of contamination under the Property establishes that its trespass and nuisance claims are continuing. Under the City's view, it does not matter when the contaminants entered its property or that any contaminants continued to migrate into the property over time so long as contaminants remain under the Property. However, the Court finds that in order to establish continuing nuisance and continuing trespass, the City must be able to establish the continuing *migration* of contaminants from the Mission Valley Terminal *into* the Property. Consequently, because the City has presented no expert evidence of continued migration of contaminants, the City lacks the ability to establish that its trespass and nuisance claims are continuing under the first test.

In determining the continuing nature of the "offense activity," *Arcade Water District v. United States*, 940 F.2d 1265 (9th Cir. 1991), is instructive. In *Arcade*, the United States government operated a laundry facility that discharged waste into a neighboring groundwater well. *Id.* at 1265. Although the laundry had been shuttered in 1973, "ground contamination from the laundry apparently continued to leach into" the plaintiff's property. *Id.* at 1266. The Ninth Circuit reversed the district court's dismissal of the nuisance claim as time-barred. *Id.* at 1269. The Ninth Circuit determined that "it is [the] leaching of contaminants, not the operation of the laundry, that is relevant in characterizing the nuisance." *Id.* at 1268. The fact that the United States had stopped the operation of the laundry had nothing to do with the continued injury suffered by the plaintiffs because they had alleged that contaminants continued to leach–or migrate–*from* the Air Force base *into* the plaintiffs' property. *Id.* at 1269.

In *Arcade*, the ongoing *migration* of the groundwater contaminants was the relevant factor that determined the continuing nature of the offense activity. Moreover, generally speaking,

---

[10]  Kinder Morgan did not raise this first test in its papers and opted to focus solely on the cost of remediation. However, the City has had notice that the migration of contaminants is an issue in Kinder Morgan's current series of summary judgment and *Daubert* motions. For example, Kinder Morgan based its motion seeking summary judgment on the City's Section 17200 claim partly on the lack of evidence that releases on the Mission Valley Terminal reached the Property during the statute of limitations period. In response, the only evidence the City presented was Forrester's expert opinions, which the Court has excluded. Thus, although Kinder Morgan did not raise the migration issue in its statute of limitations arguments, the City had notice and opportunity to present evidence of migration in response to Kinder Morgan's other contemporaneous motions.

1   continuing nuisances often involve repetitive, continuing intrusions onto the the plaintiff's

2   property.  *Stanley Works v. Snydergeneral Corp.*, 781 F. Supp. 659, 666-67 (E.D. Cal. 1990)

3   (explaining, without discussing the evidence in the record:  "In this case, *the migration or seepage*

4   *or leaching* of TCE from the defendants' parcel *into plaintiffs' parcel* has been a continuous

5   process *which is continuing even today* even though the actions which caused the TCE to get into

6   defendants' parcel so it could migrate ended some years ago.") (emphasis added); *Baker v.*

7   *Burbank-Glendale-Pasadena Airport Auth.*, 705 P.2d 866, 870 (Cal. 1985) ("The classic example

8   of a continuing nuisance is an *ongoing or repeated disturbance*, such as the one before us today,

9   caused by noise, vibration or foul odor.") (emphasis added); *Mangini v. Aerojet-Gen. Corp.*, 281

10  Cal. Rptr. 827, 838 (Cal. Ct. App. 1991) ("Every *repetition* of a continuing nuisance is a separate

11  wrong for which the person injured may bring successive actions for damages until the nuisance is

12  abated, even though an action based on the original wrong may be barred.") (quoting *Phillips v.*

13  *Pasadena*, 162 P.2d 625, 626-27 (Cal. 1945)) (emphasis added; quotations omitted).  Thus, under

14  the similar circumstances of this case as in *Arcade*, the Court looks to evidence of ongoing or

15  repeated *migration* of contaminants rather than the ongoing *presence* of contamination, which may

16  or may not be "abatable" as discussed below.

17      Here, the City has not proffered expert evidence from which a jury can find that

18  contaminants have continued to migrate from the Mission Valley Terminal into the Property.

19  Although the City's expert, Ray Forrester, generally opines that contaminants infiltrated the

20  Property before, during, and after the statute of limitations period, the Court has herein excluded

21  his opinion on a separate motion brought by Kinder Morgan.  Forrester's opinion was not properly

22  supported and did not represent evidence admissible under Rule 702.  Moreover, Forrester

23  withdrew his initial opinion and subsequently testified at deposition that he did not know whether

24  contaminants had continued to migrate to the Property.  The City has not produced any other

25  affirmative evidence of continued contaminant migration from the Mission Valley Terminal into

26  the Property.

27      In its motion for partial summary judgment, the City relies on the fact that numerous

28  releases have occurred on the Mission Valley Terminal over the years.  The City quotes various

1  statements made in depositions that essentially admit that releases that occurred on the Mission

2  Valley Terminal sometime before 2004 migrated to the Property.  Kinder Morgan does not dispute

3  that releases have occurred on its own property sometime in the past.  Nor does Kinder Morgan

4  dispute that the contamination plume under the Property is the result of a release *sometime* in the

5  past (*i.e.*, in the late 1980s or early 1990s).  However, the fact that releases occurred on Kinder

6  Morgan's own property after the original contamination was discovered does not establish that

7  such releases have *reached* the City's property, and a jury cannot reasonably infer that a release

8  automatically equates with the continuing *migration* of contaminants into City property.  Releases

9  may have been small and may have been cleaned up immediately, meaning that a small release,

10  while technically reported as a release, would not necessarily have reached the Property due to its

11  small size and immediate cleanup.  Without expert evidence that releases actually reached the

12  Property, the City cannot simply point to releases on the Mission Valley Terminal to reach the

13  unsupported conclusion that a release actually migrated to the Property.

14      Moreover, the deposition statements the City quotes do not establish continued migration.

15  Rather they simply state that releases occurred *sometime in the past* and "contributed" to

16  contamination of the Property.  This is unremarkable because Kinder Morgan does not dispute that

17  releases at some point in the past caused the contaminant plume under the Property.  However, the

18  relevant question is not whether Kinder Morgan ever contaminated the soil, but whether

19  contaminants continued to migrate onto the Property during the statute of limitations period.

20      In its reply, the City argues that "the hydraulic containment barrier would have been a

21  hollow gesture if petroleum hydrocarbon pollutants from the Mission Valley Terminal were not

22  continuing their march onto the Qualcomm Stadium site prior to installation of the barrier.  The

23  only conceivable inference thus is that petroleum hydrocarbon contamination was migrating onto

24  the City's property at least until the barrier commenced operation in 2005."  [Pl.'s Reply at 2 n.2]

25  However, this is a bare argument without evidentiary support.  Moreover, subsurface containment

26  barriers are not matters about which a layperson can testify based on his or her common

27  experience, and the City has not proffered expert evidence on this subject.  Ultimately, the City

28  has not presented evidence that shows continued migration.

1

**d.      Whether the Impact of the Condition Will Vary Over Time**

2          The second test of whether a nuisance or trespass is continuing is whether the impact of the

3   condition will vary over time.  However, it appears courts apply this test much less frequently than

4   the other two tests.  *Spar v. Pac. Bell*, 1 Cal. Rptr. 2d 480, 483 (Cal. Ct. App. 1991).  Nonetheless,

5   because this test exists, the Court evaluates whether the City has evidence to satisfy it.

6          At oral argument, the City presented the Court with two color slides that depicted a

7   graphical aerial view of the Property and purportedly illustrated the shape of the subsurface

8   contamination plume in the third quarter of 2004 and in the first quarter of 2011.[11]  The problem

9   with relying solely on these two slides to meet the present test is the inability of the layperson to

10   interpret the slides based on his or her common experience.  For example, it appears to the Court

11   that the red-outlined "Estimated Extent of Residual LNAPL," which extends into the northeast

12   corner of the Property, is identical in both slides and remains unchanged between 2004 to 2011.

13   Moreover, it appears the same is true for the blue-shaded "Primary LNAPL Zone" in the northeast

14   corner of the Property.  The only discernable difference between the two slides is the yellow-

15   shaded swath, which the slides identify as the "Dissolved Phase Plume," that splits the Property.

16   In the slide that depicts the first quarter of 2011, it appears that a portion of the northern end of the

17   plume no longer exists, but it also appears that the lower-middle portion of the plume branched

18   more eastward than the 2004 slide depicts.  According to the City, the absence of a portion of the

19   plume demonstrates that the condition has varied over time.  However, as Kinder Morgan

20   countered at the hearing, the difference in the shape of the two plumes can be attributed to a

21   variety of causes, including that the *pre-existing* contaminants shifted or moved from one location

22   to another area underneath the Property.

23          The parties' conjecture regarding the images in these slides underscores the need for a

24   qualified expert to interpret the images or data that created the images.  Consistent with other

25   portions of this Order, the Court finds that the City must proffer expert evidence that the condition

26   Kinder Morgan created varied over time based on the complexity of the subject matter.  Because

27

28
_____

[11]  While these slides were included in the papers previously filed with the Court, they were filed in black and white format, and the Court was unable to discern the different plume shapes or various colors.

1    the City has not presented any such expert evidence, the City cannot satisfy this test at trial.

2                    **e.      Whether the Condition Can be Abated at Reasonable Cost by**
                              **Reasonable Means**
3

4            Finally, the City may satisfy its burden to establish that its nuisance and trespass claims are

5    continuing by proffering evidence that the nuisance can be abated at reasonable cost by reasonable

6    means.  Kinder Morgan argues that the sole fact that remediation will cost an additional

7    $126 million necessarily means the nuisance is not continuing because the value of the Property is

8    lower than the cost of remediation.  The City argues that some courts have deemed nuisance and

9    trespass claims permanent when the costs of abatement exceed the value of the property, but other

10   courts have not.  The Court need not address these arguments here because the exclusion of

11   Forrester's opinions leaves the City without *any* evidence of the estimated final costs of

12   abatement.  Further, the City's expert, John Simon, has opined that the true extent of the

13   subsurface contamination is uncertain and that the time required to remediate the site is likewise

14   uncertain.  If the extent and time required to remediate the property are uncertain, then the cost of

15   abatement is necessarily uncertain as a result.  Without evidence of costs of abatement, the City

16   cannot satisfy its burden to show that the nuisance can be abated at *reasonable* costs.  Moreover, if

17   the extent of contamination is uncertain, the City cannot prove that it can be abated by *reasonable*

18   *means*.

19           The City bears the burden to establish that the condition under the Property is "reasonably

20   abatable."  *Skokomish Indian Tribe. v. Tacoma Pub. Utils.*, 401 F.3d 979, 991 (9th Cir. 2005).  The

21   California Supreme Court has defined "abatable" to mean "that the nuisance can be remediated at

22   reasonable cost by reasonable means." *Mangini v. Aerojet-Gen. Corp.*, 912 P.2d 1220, 1230 (Cal.

23   1996).  Abatable "means *reasonably* abatable," not literally abatable, *id.* at 1227-28 (emphasis

24   added), or abatable by any conceivable means at any cost, *McCoy v. Gustafson*, 103 Cal. Rptr. 3d

25   37, 60 (Cal. Ct. App. 2009).

26           In *Mangini*, landowners brought suit against a former lessee of a property for subsurface

27   contamination resulting from disposal of hazardous waste.  The activities of the former lessee had

28   ceased in 1970.  The plaintiffs purchased their property in 1979, were on notice of the

contamination sometime in 1979, and brought the action in 1988.  If the nuisance were permanent, the plaintiffs' claims were barred by the three-year statute of limitations applicable to nuisance claims under California law.  However, the parties did not know the extent of contamination, the type of chemicals involved, how much remediation would cost, or what remediation techniques were needed.  *Mangini*, 912 P.2d at 1224-25.  The California Supreme Court found that the plaintiffs' inability to show the extent of the contamination resulted in uncertainty about whether the nuisance is abatable:  "Thus, we do not know how much land or water has to be decontaminated.  We do not know how deep the decontamination would have to go.  We have no idea how much it would cost but know only that it would cost unascertainable millions of dollars." *Id.* at 1229-30.  Based on these unknowns, "the evidence clearly showed that no one [knew] how bad the contamination [was] or how to remedy it–indicating a substantial evidence of abatability," *id.* at 1226, and the court held that, "because plaintiffs . . . failed to present any substantial evidence that the contamination of their land . . . was capable of being abated at a reasonable cost, the nuisance must be deemed permanent . . . ." *Id.* at 1221.  Thus, because plaintiffs' nuisance claim was permanent, it was time-barred.  *Id.* at 1225.  While *Mangini* may present a more extreme example of unknown costs and means than the case at bar, the governing principle is the same:  when evidence of costs, extent, or means is lacking, the Court may deem a nuisance permanent.

Similarly, another subsurface contamination case, *McCoy v. Gustafson*, 103 Cal. Rptr. 3d 37 (Cal. Ct. App. 2009), involved the underground contamination of a property by an adjacent, uphill laundry facility.  The evidence essentially showed that no one knew how much work, time, or money would be required to remediate the property.  *Id.* at 46-47, 52-53.  After close of evidence at trial, the jury found that it was "unknown" whether the soil contamination could be abated by reasonable means at a reasonable cost.  *Id.* at 60.  The appellate court held that the trial court "should have granted the defendants' motion for judgment notwithstanding the verdict, as there was no substantial evidence that the nuisance and trespass . . . are other than permanent." *Id.* at 63.  The court also reaffirmed that "'abatable' . . . *does not mean by any conceivable means at any cost*, but by reasonable means at a reasonable cost." *Id.* at 60 (emphasis added).

In both *Mangini* and *McCoy*, the lack of evidence of reasonable costs and reasonable means rendered the nuisance "permanent" as a matter of law.  Thus, the Court's first inquiry is whether the City has proffered substantial evidence from which a jury can find that the condition beneath the Property can be abated by reasonable means for reasonable cost.  The cost of abatement is an important factor in the Court's inquiry because it is the benchmark by which the jury can determine whether abatement can be completed for *reasonable* costs.  Without evidence of the cost of abatement, the jury cannot determine whether the cost is reasonable and, as a result, cannot determine whether the condition is "abatable."  The City's expert, Forrester, estimates that it will cost $126 million, in addition to the $60 million Kinder Morgan has spent to date, to remediate subsurface contamination under the Property.  However, as the Court previously found, Forrester's opinions–including the opinion that remediation will cost an additional $126 million–are excludable under *Daubert*.  Because Forrester is the only expert who opines on the cost of remediation, the City does not have evidence of remediation costs.  As a result, the jury will lack a benchmark by which it can determine whether the cost of remediation is reasonable.

In addition to the lack of admissible evidence of costs, the City's expert, John Simon, opines that the extent of the contamination is "uncertain" and that it will take an unknown period of time to remediate the property.  [Expert Rep. of John A. Simon, Ex. 4 to Decl. of M. Ray Hartman in Supp. of Mot. to Exclude Expert Rep. of John A. Simon, Doc. No. 215-2 at 9.] Although Mr. Simon's primary opinion involved the City's ability to proceed with development of the Property based on investors' perceptions of the contamination under the site, he based his ultimate opinion on six sub-opinions, two of which render this case analogous to *Mangini* and *McCoy*.  First, Mr. Simon opines that the "extent of the contamination was uncertain," based on the apparent difficulty in identifying the outer edges of the underground contamination zone.  Essentially, Mr. Simon's main opinion was that an investor would not view the Property favorably because previously unknown contaminated areas were found in the past.  This amounts to an admission that the true extent of the contamination is not known.  [*Id.* ("The past investigation activities demonstrate just how uncertain the extent of the contamination was throughout the history of this site . . . .").]

1          Next, Mr. Simon opines that, "[t]he time required to address [the] contamination was

2    uncertain."  [*Id.* at 12.]  In doing so, he explains that potential investors need to know "with

3    reasonable certainty" the "timing when the property will become available for development . . . ."

4    [*Id.*]  However, Mr. Simon notes that "Kinder Morgan's consultants admitted that the time

5    required to address contamination was uncertain and contaminants could remain above target

6    concentrations for as long as 140 years."  [*Id.*]  Mr. Simon further explains, in part, and concludes:

7              [I]n 2004, the time required to address contamination could not have been
     predicted with any degree of certainty or confidence as the extent of the
8    contamination was not defined . . . .  It is quite clear that in 2004 the extent of the
     contamination at the Qualcomm site was unknown as the extent of the LNAPL
9    was not defined.
     . . . .
10            Based on conclusions by Kinder Morgan's own consultants, who
     estimated that the contamination removal would be completed as late as 2034 (or
11   perhaps even in 140 years), and the information that I evaluated, an investor,
     developer, or insurer had to be significantly concerned about the timing of the
12   remediation in 2004 and 2007; as they rightly should be because in 2011 Kinder
     Morgan is still addressing the contamination and the end date remains uncertain.

13

14   [*Id.* at 12, 14.]

15          Further still, the Water Board's orders reflect the uncertainty regarding the extent and

16   abatability of the subsurface contamination under the Property.  In 1994, the Water Board

17   acknowledged the difficulty of remediating the Property and granted a 5-year extension to achieve

18   cleanup goals because "[g]roundwater modeling information was provided indicating that

19   significant groundwater contamination will still exist after 10 years of treatment with the proposed

20   corrective plan."  [Add. No. 1 to CAO 92-01.]  In 2002, the Water Board reaffirmed this

21   statement:  "The January 1, 1999 final cleanup date was technically unachievable.  Groundwater

22   modeling information provided in 1994 indicated that significant groundwater contamination

23   would still exist after 10 years of cleanup under the corrective action plan in effect at the time."

24   [Add. No. 4 to CAO 92-01.]

25          Based on the foregoing, the Court finds that the City lacks evidence from which a jury can

26   find that the condition under the Property is capable of remediation by reasonable means at

27   reasonable cost.

28   / / /

1          **f.      Conclusion**

2          Because the City does not have evidence that its nuisance and trespass claims are

3   "continuing" within the meaning of California authority, a jury cannot reach such a conclusion,

4   and the Court deems the City's trespass and nuisance claims permanent. *McCoy*, 103 Cal. Rptr. 3d

5   at 59, 63.  Consequently, the City's private nuisance and trespass claims are barred by the statute

6   of limitations.

7          **2.      Kinder Morgan is Entitled to Summary Judgment on the Additional Basis
                    That the City Cannot Prove the Damages Element of its Nuisance and
8                    Trespass Claims**

9          Even if the City's private nuisance and trespass claims were not time-barred, Kinder

10   Morgan is entitled to summary judgment because the City cannot meet its burden to establish the

11   "damages" element of these tort claims.  This is an additional and independent basis to enter

12   judgment on these claims in Kinder Morgan's favor.

13          In its opposition to the City's motion for summary judgment, Kinder Morgan notes that the

14   City claims three types of damages:  (1) "restoration" costs, (2) lost use of groundwater, and (3)

15   redevelopment lost revenue.  [Doc. No. 218 at 8.]  Kinder Morgan further argues that "the City has

16   no damages of any kind" based on Kinder Morgan's other contemporaneous summary judgment

17   motions on the damages claims.  Because the Court awards Kinder Morgan summary judgment on

18   these three types of damages, the City cannot meet its burden at trial to establish the damages

19   element of its trespass and nuisance claims.

20          The City argues that it is entitled to nominal damages as a "fallback award if [it] is unable

21   to prove compensatory damages to the trier of fact."  [Doc. No. 251 at 5.]  However, the maxim *de*

22   *minimis non curat lex* applies to the circumstances of this case.  *See Skaff v. Meridien N. Am.*

23   *Beverly Hills, LLC*, 506 F.3d 832, 839-40 (9th Cir. 2007) ("The ancient maxims of *de minimis non*

24   *curat lex* and *lex non curat de minimis* teach that the law cares not about trifles."); *see also* Cal.

25   Civ. Code § 3533 ("The law disregards trifles."); *Kluge v. O'Gara*, 38 Cal. Rptr. 607, 609 (Cal. Ct.

26   App. 1964) ("The term 'nominal damages' describes two types of award -- a trifling or token

27   allowance for mere technical invasion of a right, without actual damage; and the very different

28   allowance made when actual damages are substantial, but their extent and amount are difficult of

1    precise proof."); *Avina v. Spurlock*, 105 Cal. Rptr. 198, 200 (Cal. Ct. App. 1972) ("By nominal

2    damages is meant some trifling sum, as a penny, one cent, six cents, etc.") (quoting *Davidson v.*

3    *Devine*, 11 P. 664, 665 (Cal. 1886)); *see generally Harris v. Time, Inc.*, 237 Cal. Rptr. 584, 589

4    (Cal. Ct. App. 1987) (discussing case with technically valid, but trifling, claims and the resulting

5    waste of judicial resources).  To allow a case, such as the one at bar, to proceed to trial–and engage

6    in all the hearings, pretrial motion practice, and other steps which lead to trial–where the City once

7    sought damages in the hundreds of millions, but now may seek only nominal damages would be a

8    grand waste of judicial resources and an exercise in futility.

9           In light of the rulings set forth herein, and based on the maxim *de minimus non curat lex*,

10   the Court finds that the City cannot prove the "damages" element of its private nuisance and

11   trespass claims at trial.  The Court accordingly enters judgment in favor of Kinder Morgan on

12   these two claims on this additional, independent basis.

13          **3.      The City's Public Nuisance *per se* Claims**

14          Although the statute of limitations bars the City's private nuisance and trespass claims, it

15   does not bar the two public nuisance claims brought by the City and People of the State of

16   California.[12]  *Beck Dev. Co. v. S. Pac. Transp. Co.*, 52 Cal. Rptr. 2d 518, 556 (Cal. Ct. App. 1996)

17   ("While there is no statute of limitations in an action brought by a public entity to abate a public

18   nuisance, there is a three-year statute of limitations in a nuisance action brought by a private

19   party.") (citing Cal. Civ. Code § 3490; Cal. Code. Civ. Proc. § 338; *Mangini v. Aerojet-Gen.*

20   *Corp.*, 281 Cal. Rptr. 827, 837 (Cal. Ct. App. 1991)).  Kinder Morgan argues the City is not

21   entitled to summary judgment on its public nuisance claims because the City has not provided

22   evidence on several elements of the tort.  The City counters that the mere fact of contamination of

23   groundwater is enough to establish its public nuisance claim based on the theory of public

24   nuisance *per se*.  The City's argument is legally incorrect, and Kinder Morgan is entitled to

25   _____

26          [12]  The San Diego City Attorney brought suit on behalf of the People pursuant to the authority to do so under
California Code of Civil Procedure section 731.  Specifically, section 731 provides that, "[a] civil action may be
27   brought in the name of the people of the State of California to abate a public nuisance, as defined in Section 3480 of
the Civil Code, . . . by the city attorney of any town or city in which the nuisance exists."  The City and the People are
28   represented by the same attorneys.  The People's public nuisance claim is derivative of the City's claim and depends
on the same evidence.  Thus, if the City is unable to proffer evidence in support of its own public nuisance claim, the
People will not have additional evidence to prove their public nuisance claim.

judgment on the public nuisance *per se* claim because the City has not identified a statute that deems the condition under the Property a public nuisance.  Kinder Morgan is further entitled to summary judgment on this claim because the City does not have evidence of the following element of the tort: that the condition under the Property affected a substantial number of people at the same time.

### a.    Legal Standard

To prevail on a claim for public nuisance, the City bears the burden to establish the following elements:

1.    That [Kinder Morgan], by acting or failing to act, created a condition that [1] was harmful to health; or [2] was indecent or offensive to the senses; or [3] was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property; or [4] unlawfully obstructed the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway;

2.    That the condition affected a substantial number of people at the same time;

3.    That an ordinary person would be reasonably annoyed or disturbed by the condition;

4.    That the seriousness of the harm outweighs the social utility of [Kinder Morgan]'s conduct;

5.    That [the City] did not consent to [Kinder Morgan]'s conduct;

6.    That [the City] suffered harm that was different from the type of harm suffered by the general public; and

7.    That [Kinder Morgan]'s conduct was a substantial factor in causing [the City]'s harm.

CACI 2020; *see also* Cal. Civ. Code § 3480 ("A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.").

However, "a nuisance *per se* arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance. . . .  [T]o rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law." *Beck Dev. Co.*, 52 Cal. Rptr. 2d at 549-50.  "[W]here

- 45 -

1   the law expressly declares something to be a nuisance, then no inquiry beyond its existence need

2   be made . . . ."  *Id.* at 550.  "Nuisances *per se* are so regarded because no proof is required, beyond

3   the actual fact of their existence, to establish the nuisance."  *City of Costa Mesa v. Soffer*, 13 Cal.

4   Rptr. 2d 735, 737 (Cal. Ct. App. 1992) (internal quotations and footnote omitted).

5
                **b.**     **The City is Not Entitled to Summary Judgment on its Public Nuisance**
6                          ***Per Se* Claim; Kinder Morgan is Entitled to Summary Judgment on**
                          **This Claim**
7
8           In support of its public nuisance claim, the City first argues that it does not need to prove

9   anything beyond the existence of groundwater contamination because its claim is for public

10  nuisance *per se*.  Specifically, in response to Kinder Morgan's Rule 56(f) request for summary

11  judgment, the City asserts in its reply brief:  "As the City set forth in its opening papers, the

12  pollution of water may be considered a nuisance per se, such that the mere existence of the

13  pollution suffices to establish a nuisance without the necessity of balancing any other factors."

14  [Doc. No. 251 at 4 (citing *Beck Dev. Co.*, 52 Cal. Rptr. 2d at 549-50; *Newhall Land & Farming

15  Co. v. Superior Court*, 23 Cal. Rptr. 2d 377, 381 (Cal. Ct. App. 1993)).]  Contrary to this assertion,

16  the City did not indicate in its motion that contamination alone rendered its claim a public

17  nuisance *per se*.  Moreover, while *Beck Development Co.* explained that "to be considered a

18  nuisance *per se* the object, substance, activity or circumstance at issue must be expressly declared

19  to be a nuisance by its very existence by some applicable law," *see Beck Dev. Co.*, 52 Cal. Rptr. 2d

20  at 550, the City has not identified any such statutory provision in its motion or reply brief.

21  Consequently, the City is not entitled to summary judgment on its public nuisance *per se* claim.

22          Neither *Newhall* nor *Beck Development Co.* alters this conclusion.  While *Beck

23  Development Co.* held that the Porter-Cologne Water Quality Control Act ("Water Act") did not

24  support a finding of nuisance *per se* because it was not operative in 1970, the Court did *not* hold

25  that the Water Act *would have supported* a nuisance *per se* claim had it applied in *Beck

26  Development Co.*  While the City seems to imply this is the case, it does not affirmatively argue

27  this result or identify any provision in the Water Act–or any other statute–that supports its

28  nuisance *per se* claim.  Nor does *Newhall* support the City's assertion that "the mere existence of
    the pollution suffices to establish a nuisance without the necessity of balancing any other factors."

Rather, the Court construes *Newhall* in light of the related caselaw and CACI 2020, and finds that groundwater contamination is the kind of activity that *may* be the basis for a nuisance claim in general.  The City's reading of *Newhall* renders a public nuisance claim and public nuisance *per se* claim indistinguishable–if the mere existence of pollution is the sole "factor" establishing a nuisance, the City's position eviscerates the remaining elements of the public nuisance tort from CACI 2020.

The City's public nuisance *per se* claim fails even under the correct legal standard.  Although the City has not identified a statute in its motion or reply brief, the First Amended Complaint alleges San Diego Municipal Code section 54.0701 declares that the subsurface contamination under the Property may be a public nuisance.  Specifically, section 54.0701 provides that "*Property* within the City containing *hazardous material* is a *public nuisance*."  San Diego Municipal Code 54.0701(b) (italics in original).  The SDMC defines the italicized terms in this section by reference to California Health and Safety Code section 25401.1.[13]  Section 25401.1, in turn, defines "Property" as "real property."  Cal. Health & Saf. Code § 25401.1(h)(1).  However, this section exempts as "Property" any "[s]ite that is, or becomes, subject to an enforcement action or order issued by a regional board pursuant to Division 7 (commencing with Section 13000) of the Water Code . . . ."  *Id.* § 25401.1(h)(2)(E).  It is undisputed that both the Mission Valley Terminal and any "contamination that has migrated off-site" are subject to an enforcement order issued by the Water Board, which is authorized by Water Code sections 13000 *et seq.*  *See* Cleanup & Abatement Order 92-01 at 5, 7.  As a result, the Mission Valley Terminal and associated off-site contaminated land are not "Property" within the meaning of San Diego Municipal Code section 54.0701.  Because it does not apply to the Property and associated off-site land, section 54.0701 does not deem the condition beneath these areas a public nuisance.  Accordingly, section 54.0701 cannot serve as the basis for the City's public nuisance *per se* claim,

---

[13]  Although Health and Safety Code section 25401.1 was repealed as of June 27, 2012, it was in effect as of the filing of this suit.  The California Legislature repealed the California Land Environmental Restoration and Reuse Act, commencing with Health and Safety Code section 25401, but did not express an intent to repeal the act retroactively.  Thus, the definitions in effect as of the filing of Plaintiffs' suit remain in effect for purposes of this analysis.  *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1218 n.1 (9th Cir. 2003) (Hall, J., dissenting).  The definitions in section 25401.1 were in effect as of the filing of this case in 2004.

07CV1883

1    and the City cannot prevail on its public nuisance *per se* claim at trial.

2              **c.    Kinder Morgan is Entitled to Summary Judgment on the City's Public Nuisance Claim**

3

4              The City argues that even if it is required to prove anything beyond the mere existence of

5    contamination, summary judgment in its favor is proper because it has presented evidence of

6    substantial public impact.  The City argues that it "has submitted an extensive amount of evidence

7    regarding the interference with the use and development of the Qualcomm site due to the

8    contamination, as well as its impact on rental value and contracts regarding the site . . . ."  [Doc.

9    No. 251 at 5.]  However, as the Court previously concluded, the City lacks evidence of the impact

10   on the City's ability to develop, rent, or use the Property.  Thus, the City cannot rely on these

11   damages theories to show public impact.

12             As explained herein, the City lacks evidence that Kinder Morgan's conduct hindered its

13   ability to freely use the Property.  Accordingly, the Court finds that the City lacks evidence that

14   Kinder Morgan created a condition that interfered with the free use of the Property.  However,

15   even if the City had evidence that the contamination restricted its free use of the Property, this

16   would merely satisfy the first element of the public nuisance claim and would not address Kinder

17   Morgan's argument that the City lacks evidence on the second element–that "the condition

18   affected a substantial number of people at the same time."

19             As Kinder Morgan argues, it is entitled to summary judgment on the public nuisance

20   claims because, in addition to the lack of evidence that the subsurface contamination has had an

21   impact on the public's use of the Property such that it has "affected a substantial number of people

22   at the same time," undisputed evidence exists that the contamination *has not* affected a substantial

23   number of people at the same time:

24             It is . . . undisputed that neither the petroleum releases nor the remediation have
             interfered with the use of the Property as a Stadium, cost the City any rent under
25           its existing leases (which it cannot lawfully terminate), or caused the cancellation
             of any events.  Nor can the City demonstrate that anyone has even perceived the
26           underground petroleum.  The City boasts that hundreds of thousands of visitors
             come to more than 200 annual events at Qualcomm Stadium each year.  Despite
27           millions of visitors to thousands of events since 2004, there is no indication that
             anyone was aware of or affected by petroleum impacts beneath the parking lot.
28           In brief, the City cannot show that anyone—let alone a substantial number of
             people—has been harmed as a result of the conditions it alleges.

1  [Doc. No. 218 at 6 (citations to evidence omitted).]  In its reply brief, rather than present evidence

2  to rebut Kinder Morgan's arguments and identify evidence that the contamination has affected a

3  substantial number of people, the City instead asserts that the public nuisance claims are public

4  nuisance *per se* claims.  [*See* Doc. No. 251 at 4-5.]  The City also asserts that "it is ludicrous to

5  assert that no one in San Diego was aware of contamination under the Stadium."  However, mere

6  knowledge of contamination is not probative of the fact that anyone–much less a substantial

7  number of people–was "affected" by the condition Kinder Morgan created, and such an inference

8  cannot be made from the mere fact of knowledge of contamination.  Accordingly, because the City

9  lacks evidence on the "substantial impact" element of the public nuisance tort, the City cannot

10  prevail at trial, and Kinder Morgan is entitled to summary judgment on the public nuisance claim.

11  **F.**      **Kinder Morgan's Motion for Summary Judgment on the City's Section 17200 Claim**

12          Finally, Kinder Morgan moves for summary judgment on the City's seventh cause of

13  action, which asserts violations under California's Unfair Competition Law ("UCL"), codified at

14  Business and Professions Code section 17200 *et seq.* ("Section 17200").   The City alleges Kinder

15  Morgan knowingly discharged or released chemicals "known to cause cancer or reproductive

16  toxicity into water or into land where such chemical passes or probably will pass into a source of

17  drinking water."  [FAC ¶ 131.]  The City claims these releases violate several state laws and

18  regulations, including California Water Code sections 13350 and 13387, California Health and

19  Safety Code sections 5411, 5411.5 and 25249.5, and California Fish and Game Code section 5650,

20  forming the basis for its Section 17200 claim.  [*Id.*]  The Court finds that the City has no evidence

21  to support its Section 17200 claim and therefore **GRANTS** Kinder Morgan's motion.

22          **1.**      **Statute of Limitations**

23          Section 17200 has a four year statute of limitations.  Cal. Bus. & Prof. Code § 17208;

24  *Rodriguez v. U.S. Bank Nat. Ass'n*, 2012 WL 1996929, at *2-3 (N.D. Cal. 2012).  This four-year

25  limitations period "admits of no exceptions."  *Cortez v. Purolator Air Filtration Prods. Co.*, 999

26  P.2d 706, 716 (Cal. 2000).  In cases relating to contamination, UCL claims must be brought within

27  four years of an actual release of contaminants.  *See O'Connor v. Boeing N. Am., Inc.*, 92 F. Supp.

28  2d 1026, 1053 (C.D. Cal. 2000), *rev'd in part on other grounds by O'Connor v. Boeing N. Am.,*

1   *Inc.*, 311 F.3d 1139 (9th Cir. 2002) ("[T]he unfair practice is Defendants' conduct of releasing

2   contaminants into the neighborhood.  Thus, to the extent that this claim is based on Defendants'

3   conduct that occurred [outside the statute of limitations period] it is barred by the statute of

4   limitations.  However, to the extent that it is based on conduct occurring [within the statute of

5   limitations period] the claim survives.").

6          The City argues that the three-year "rolling" limitations period applicable to continuing

7   nuisances should likewise apply to its Section 17200 claim.  [Pl.'s Opp. at 8.]  However, while

8   Section 17200 "borrows" violations of other laws and treats them as "unlawful" practices, *Cel-*

9   *Tech Commc'ns, Inc. v. LA Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999), no case similarly

10  stands for the proposition that Section 17200 also borrows statute of limitations periods.  Instead,

11  Section 17200 has its own, strict, four-year limitation period.

12         The City filed this lawsuit on August 14, 2007, and thus it cannot base any Section 17200

13  claim on releases occurring before August 14, 2003.  Five of the alleged releases occurred outside

14  of this period and are thereby time-barred.[14]

15         **2.     Expert Testimony**

16         Under California law, a plaintiff must support a claim with expert testimony on any issue

17  that is beyond the common experience of laymen.  *Miller v. L.A. Cnty. Flood Control Dist.*, 505

18  P.2d 193, 202 (Cal. 1973).  Without such expert testimony, a plaintiff cannot make out a prima

19  facie case and the claim fails.  *See id.*

20         Here, whether the claimed releases reached or threatened the waters of the state is outside

21  the common experience of laypersons, and therefore requires expert testimony.  As Kinder Morgan

22  argues, "whether releases of petroleum at or near the surface reached groundwater approximately

23  10 feet beneath the surface is by definition a technical question.  It is not a readily observable

24  event, and requires the application of technical knowledge from myriad fields, including geology,

25  hydrogeology and fluid dynamics."  [Defs.' Mot. at 8.]

26         The City asserts that "common sense" dictates that releases reached the Property, following

27

28
―――――――――――――――
[14] These releases occurred on (1) January 30, 1994; (2) December 22, 1994; (3) January 9, 1995; (4) January 4, 2001; and (5) September 16, 2001.

the same path as prior contaminants.  The Court disagrees.  One cannot presume that a release in the early-2000s would migrate in the same fashion as releases from the 1980s and 1990s.  Natural shifts in the landscaping no doubt occurred in this time, and further, in 2005, Kinder Morgan installed containment wells at the site for the purpose of preventing pollutants from flowing onto the Property.  The presence of the wells *may* altogether prevent releases from reaching the City's property–another issue about which laymen cannot testify.

Further, despite the City's current insistence to the contrary, its representatives previously acknowledged the necessity of expert testimony regarding whether the releases potentially reached groundwater.  For example, the Rule 30(b)(6) deponent for the City testified that whether releases reached the City's property requires expert testimony, and was beyond her knowledge:

> Q.  Okay.  What's the City's basis - aside from anything that you've learned only from your attorneys or their consultants working for your attorneys, what is the City's contention that that release reached their property?
>
> MR. TEKOSKY: Objection.  *Calls for expert opinion*.
>
> Q.  You say it got to your property.  I'm saying how do you know?
>
> A.  That those molecules from that particular instance was there, *I would rely upon the experts for that*.
>
> Q.  So without having an expert tell you, you don't know?
>
> A.  I don't know.

[Hartman Decl., Doc. No. 213-3; Steirer Depo. at 352:8-23 (emphasis added).]  For all these reasons, the Court concludes that the City is required to support its Section 17200 claim with expert testimony.

To that end, the City's only expert to offer testimony in support of the Section 17200 claim is Ray Forrester.  As explained above, the Court finds that Forrester's testimony is unreliable, and excludes his testimony on that basis.  Accordingly, the City cannot present the requisite expert testimony needed to establish that any alleged releases reached the Property.  Therefore, the Court **GRANTS** Kinder Morgan's motion for summary judgment on the City's Section 17200 claim.

///

///

1

### IV.  CONCLUSION

2      The hallmark of our judicial system is the uniform application of longstanding legal

3  doctrines that seek to separate reason from emotion, evidence from speculation, and provable fact

4  from the merely possible.  Statutes of limitations, legal standards, burdens of proof, and rules of

5  evidence play leading roles in this process, and together determine the outcome of this case.  The

6  Court enters judgment in favor of Kinder Morgan not because doubt exists that Kinder Morgan has

7  contaminated the Property in the past two or three decades, but because the City has not complied

8  with applicable statutes of limitation nor gathered the evidence necessary to meet its burden of

9  proof at trial.  Accordingly, the Court rules as follows:

10  (1)      Doc. No. 202:  Kinder Morgan's motion for partial summary judgment on the City's

11          groundwater-related damages is **GRANTED**.

12  (2)      Doc. No. 206:  Kinder Morgan's motion for partial summary judgment on the City's real

13          estate and restoration damages is **GRANTED**.

14  (3)      Doc. No. 208:  Kinder Morgan's motion to exclude the expert report of Mr. Ray Forrester

15          is **GRANTED**.

16  (4)      Doc. No. 210:  The City's Motion for partial summary judgment on its nuisance and

17          trespass claims is **DENIED** as moot.  The Court **GRANTS** Kinder Morgan's request for

18          entry of judgment pursuant to Rule 56(f) and enters judgment in favor of Kinder Morgan

19          on the private nuisance, trespass, and two public nuisance claims.

20  (5)      Doc. No. 213:  Kinder Morgan's motion for summary judgment on the City's section

21          17200 claim is **GRANTED.**

22  (6)      Doc. No. 214:  Kinder Morgan's motion for partial summary judgment on the City's

23          nuisance claim and prayer for punitive damages is **GRANTED**.

24  (7)      The following motions are **DENIED** as moot:

25          (a)      Doc. No. 203:  Defendants' motion to exclude testimony and opinions of Plaintiffs'

26                  expert, Dr. Steven Waters;

27          (b)      Doc. No. 204:  Defendants' motion to exclude testimony and opinions of Plaintiffs'

28                  rebuttal expert, Dr. David Huntley;

1      (c)      Doc. No. 205:  Defendants' motion to exclude testimony and opinions of Plaintiffs'

2      rebuttal expert, Ken Wilkins;

3      (d)      Doc. No. 207:  Defendants' motion to exclude expert testimony of Randal Bell

4      MAI and David Davis;

5      (e)      Doc. No. 211:  Defendants' motion to exclude and/or strike Plaintiffs' rebuttal

6      expert, William S. Cain;

7      (f)      Doc. No. 212:  Defendants' motion to exclude Plaintiffs' expert, Stephen A.

8      Johnson;

9      (g)      Doc. No. 215:  Defendants' motion to exclude expert testimony of John A. Simon

10      and strike improper rebuttal opinions; and

11      (h)      Doc. No. 216:  Defendants' motion to exclude expert testimony of Charles E. Black

12      and strike improper rebuttal opinions.

13      The Clerk of Court is instructed to terminate this action and enter judgment in favor of

14 Kinder Morgan on all claims in the First Amended Complaint.

15      **IT IS SO ORDERED.**

16 Dated: January 25, 2013

17

18      Hon. Michael M. Anello
      United States District Judge

19

20

21

22

23

24

25

26

27

28